**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Allison Watson (CA 328596)
awatson@bathaeedunne.com
Priscilla Ghita (CA admission pending)
pghita@bathaeedunne.com
3420 Bristol Street Suite 600
Costa Mesa, CA 92626
Tel.: (213) 458-7075

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*p.h.v.* forthcoming)
egrauman@bathaeedunne.com
Kaki J. Johnson (*p.h.v.* forthcoming)
kjohnson@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (332) 223-4386

*Attorneys for Plaintiffs and the
Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL CARR, MELODY HOJATI, SAMMY PAZ, ROSA URIBE, TANYA PARMELEE, SEBASTIAN SZYLKOWSKI, CHIRAAG "CK" PATEL, JOHN MCLAUGHLIN, KYLE MILLER, MELISSA RYAN, KYLENE WEAVER, BRADLEY TRINH, PAURANG PATEL, SEAN GRIFFIN, CLARKTON MOORE, ZACHARY KUPEC, SAI VEERABRAHMA, FAROOQ AMLANI, CASEY LEE, MELODY MAYNARD, and FEROZ KHAN MOHAMMED, individually and on behalf of all those similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>HONDA MOTOR COMPANY, LTD., a Japanese corporation; AMERICAN HONDA MOTOR COMPANY, INC., a California corporation; and HONDA DEVELOPMENT & MANUFACTURING OF AMERICA, LLC, an Ohio corporation.<br><br>        Defendants. | Case No. 26-cv-04431<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

INTRODUCTION .................................................................................................................. 1

PARTIES ................................................................................................................................. 3

I.       PLAINTIFFS ............................................................................................................... 3

II.      DEFENDANTS ......................................................................................................... 15

JURISDICTION AND VENUE ............................................................................................ 17

DIVISIONAL ASSIGNMENT.............................................................................................. 18

FACTS ................................................................................................................................... 19

I.       HONDA MARKETED THE CLASS VEHICLES AS SAFE AND RELIABLE FAMILY
         VEHICLES AND KNEW THESE ATTRIBUTES WERE MATERIAL TO CONSUMERS... 19

II.      THE SPONTANEOUS AIRBAG DEPLOYMENT DEFECT ..................................................... 25

         A.      National Highway Traffic Safety Administration's Investigation ................................... 25

         B.      The SRS System and How Side Airbags Work ........................................................... 27

III.     CONSUMER REPORTS OF THE SPONTANEOUS AIRBAG DEPLOYMENT DEFECT ... 30

IV.      HONDA'S KNOWLEDGE OF THE DEFECCT ..................................................................... 44

         A.      Honda's Testing ...................................................................................................... 44

         B.      Consumer Complaints Related to Class Vehicles and Honda's Own Investigations ...... 45

         C.      Honda Has Previously Recalled Class Vehicles for Other Safety Defects, Including
                 Airbag-Related Defects......................................................................................... 48

         D.      Honda Could Have Made Plaintiffs and Members of the Classes Aware of the Defect at
                 the Point of Sale ..................................................................................................... 51

V.       HONDA ANNOUNCES A RECALL BASED ON THE SPONTANEOUS AIRBAG
         DEPLOYMENT DEFECT ........................................................................................ 52

VI.      THE HARM TO PLAINTIFFS AND THE CLASSES............................................................... 53

TOLLING OF THE STATUTES OF LIMITATIONS ........................................................... 55

CLASS ACTION ALLEGATIONS ....................................................................................... 56

CLAIMS FOR RELIEF ......................................................................................................... 66

         A.      Claims Brought on Behalf of the California Class ......................................................... 66

         B.      Claims Brought on Behalf of the Florida Class ........................................................... 74

         C.      Claims Brought on Behalf of the Georgia Class........................................................... 77

         D.      Claims Brought on Behalf of the Illinois Class ............................................................ 81

         E.      Claims Brought on Behalf of the Indiana Class............................................................ 82

         F.      Claims Brought on Behalf of the Kentucky Class ........................................................ 87

         G.      Claims Brought on Behalf of the Michigan Class ......................................................... 88

         H.      Claims Brought on Behalf of the Nebraska Class ........................................................ 89

         I.      Claims Brought on Behalf of the North Carolina Class ................................................ 94

i

     J.      Claims Brought on Behalf of the Ohio Class.................................................................. 97

     K.     Claims Brought on Behalf of the Pennsylvania Class .................................................... 101

     L.     Claims Brought on Behalf of the Texas Class ............................................................... 103

PRAYER FOR RELIEF ..................................................................................................................... 108

JURY DEMAND ................................................................................................................................ 109

**INTRODUCTION**

1. This is a consumer class action against Honda Motor Co., Ltd. and its United States subsidiaries for concealing a dangerous safety defect in the 2018–2022 Honda Odyssey—the best-selling minivan among individual American car buyers and a vehicle that Honda marketed to families as safe and reliable.

2. Honda's own press materials promoted the Odyssey's side curtain airbag system as providing "a significant level of head protection" for occupants in "all outboard seating positions." But in fact, this airbag system can deploy without warning and without a crash, creating safety and economic risks for Odyssey owners and passengers.

3. Plaintiffs are Honda Odyssey owners who purchased their vehicles believing Honda's safety representations. They bring this suit on behalf of themselves and all similarly situated purchasers and lessees of Class Vehicles in California, Florida, Georgia, Illinois, Indiana, Kentucky, Michigan, Nebraska, North Carolina, Ohio, Pennsylvania, and Texas.

4. The Honda Odyssey's Supplemental Restraint System ("SRS") suffers from a defect that causes side curtain and side thorax airbags to deploy spontaneously—without any collision, without any warning, and without any dashboard indication.

5. In some cases, airbags in Honda's defective vehicles fire after the vehicle encounters a minor road surface irregularity such as a pothole or speed bump. In others, airbags fire with no discernible external trigger at all: consumers have reported spontaneous deployment while driving on flat roads, while slowing to a stop, and even while refueling a stationary vehicle.

6. The Spontaneous Airbag Deployment Defect poses serious safety risks and renders Class Vehicles worth substantially less than what Plaintiffs and members of the Classes paid for them. When airbags deploy unexpectedly, occupants are subjected to explosive force, chemical fumes, and loss of visibility. Consumers have reported burns, hearing damage—including to children—and inability to safely navigate their vehicles after deployment. Following a spontaneous deployment, the vehicle's entire SRS system is disabled until repaired at a cost ranging from $3,000 to $11,000—repairs that Honda has routinely refused to cover under warranty. Had Plaintiffs and Class Members known the truth about the defect, they would not have purchased their vehicles at the prices they paid, or at all.

1

7.      Honda knew. As early as May 2019—before some Plaintiffs even purchased their vehicles—consumers were filing complaints with the National Highway Traffic Safety Administration ("NHTSA") reporting spontaneous airbag deployment in Class Vehicles. Honda's own employees and dealers submitted at least one Early Warning Report field report to NHTSA identifying the spontaneous deployment pattern as a possible defect. Honda's own diagnostic systems recorded unexplained deployment events but could not determine a cause—one dealership reported "a code for the airbags deploying but not a code for why they deployed." And Honda's internal case management system tracked consumer after consumer reporting the same defect. Plaintiffs allege Honda had notice of this issue and did not disclose or remediate it. During this same period, Honda issued recalls for the same vehicles to address other airbag-related defects—including a defective airbag sensor—while not addressing the reported pattern of spontaneous deployments.

8.      Honda's responses to affected consumers also show a consistent pattern. Honda told one consumer that spontaneous airbag deployment is "normal" and that "even a speed bump could activate the airbag." Honda told another that "the air bag might deploy at 26 MPH." Honda told a third that the deployment was "his fault." Honda dealerships blamed tire impacts, potholes, and "a hole under the subframe"—and then denied warranty coverage and told consumers to file collision claims with their insurance companies, even though no collision had occurred. This uniform pattern of deflection—across different states, dealerships, and years—is consistent with a companywide approach of attributing incidents to external causes rather than acknowledging a defect.

9.      Plaintiffs further allege this defect pattern is concentrated in Honda Odyssey vehicles. Comparable minivans sold during the same period—the Toyota Sienna, the Kia Carnival, and the Chrysler Pacifica—have virtually no analogous complaints in the NHTSA database. Based on the complaint data, Plaintiffs allege the issue is specific to the Odyssey SRS design, engineering, calibration, and programming controlled by Honda.

10.      NHTSA opened an investigation into the defect on October 28, 2025, identifying a potential population of 441,002 affected vehicles.

11.      Plaintiffs seek damages, restitution, and injunctive relief on behalf of themselves and the Classes to compensate for the diminished value of their vehicles, the cost of repairs Honda has refused to

2

cover, out-of-pocket expenses including car rental and towing charges, loss of use, and the harm caused by Honda's concealment of a known safety defect in vehicles it sold to families across America.

**PARTIES**

**I.    PLAINTIFFS**

12.    Plaintiff Melody Hojati is a resident of Laguna Niguel, California. In Summer 2019, Plaintiff Hojati purchased a new 2019 Honda Odyssey EX-L from a Honda dealership in Costa Mesa, California for $43,250.12, primarily for personal, family, and household use.

13.    Prior to her purchase, she conducted a good deal of research on the vehicle, including reading descriptions from the Honda website, speaking with multiple sales agents from various Honda dealerships, reading online forum reviews, and speaking to friends and family regarding their experiences with and perception of the Honda Odyssey. None of the representations Ms. Hojati received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

14.    Ms. Hojati believes airbags are important for safety. Safety and reliability were important factors behind her decision to purchase the 2019 Honda Odyssey EX-L. To date, Ms. Hojati's 2019 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Ms. Hojati is aware.

15.    Ms. Hojati would not have purchased her 2019 Honda Odyssey EX-L at the price she paid had she known about the Spontaneous Airbag Deployment Defect described in this Complaint. Ms. Hojati was overcharged for her 2019 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

16.    Plaintiff Sammy Paz is a resident of Oxnard, California. In May 2023, Plaintiff Paz purchased a used 2022 Honda Odyssey EX-L from Mazda of Oxnard in Oxnard, California for $40,330, primarily for personal, family, and household use.

17.    Prior to his purchase, he spoke with a sales representative at a Honda dealership and later with a friend who is a car sales manager elsewhere. None of the representations Mr. Paz received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

18.    Mr. Paz believes airbags are important for safety. Prior to purchasing his 2022 Honda Odyssey EX-L, Mr. Paz did not believe safety would be a concern with Honda vehicles due to his

3

confidence in the Honda brand. To date, Mr. Paz's 2022 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Paz is aware.

19. Mr. Paz would not have purchased his 2022 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Paz was overcharged for his 2022 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

20. Plaintiff Rosa Uribe is a resident of Buellton, California. In 2019, Plaintiff Uribe purchased a used 2018 Honda Odyssey from a Honda dealership in San Luis Obispo, California for approximately $41,699.28, primarily for personal, family, and household use.

21. Prior to her purchase, she reviewed the Honda website and other online reviews and also spoke to family and friends who recommended the Honda Odyssey for reliability, safety, and longevity. None of the representations Ms. Uribe received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

22. Ms. Uribe believes airbags are important for safety. Safety and reliability were important factors behind her decision to purchase the 2018 Honda Odyssey. To date, Ms. Uribe's 2018 Honda Odyssey has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Ms. Uribe is aware.

23. Ms. Uribe would not have purchased her 2018 Honda Odyssey had she known about the Spontaneous Airbag Deployment Defect described in this Complaint. Ms. Uribe was overcharged for her 2018 Honda Odyssey due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

24. Plaintiff Tanya Parmelee is a resident of Saint Robert, Missouri. In August 2020, while residing in Madera, California, Plaintiff Parmelee purchased a new 2020 Honda Odyssey EX-L from the Honda North dealership in Clovis, California for approximately $53,000, primarily for personal, family, and household use.

25. Prior to her purchase, Plaintiff Parmelee relied on the Honda website and online reviews of the car. None of the representations Ms. Parmelee received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

4

26. Ms. Parmelee believes airbags are important for vehicle safety. Safety was an important consideration in her decision to purchase the 2020 Honda Odyssey EX-L for her family. To date, Ms. Parmelee's 2020 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Ms. Parmelee is aware.

27. Ms. Parmelee would not have purchased her 2020 Honda Odyssey EX-L had she known about the Spontaneous Airbag Deployment Defect described in this Complaint. Ms. Parmelee was overcharged for her 2020 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

28. Plaintiff Sebastian Szylkowski is a resident of Beverly Hills, Florida. In Summer 2021, Plaintiff Szylkowski purchased a used 2021 Honda Odyssey EX-L from Village Toyota in Homosassa, Florida for approximately $35,276.89, primarily for personal, family, and household use.

29. Prior to his purchase, he visited Village Toyota and inspected both a Toyota Highlander and the 2021 Honda Odyssey EX-L that he ended up purchasing, and he also reviewed a few online websites regarding the Honda Odyssey. Mr. Szylkowski also relied on his confidence in the Honda brand. None of the representations Mr. Szylkowski received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

30. Mr. Szylkowski believes airbags are important for safety. To date, Mr. Szylkowski's 2021 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Szylkowski is aware.

31. Mr. Szylkowski would not have purchased his 2021 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect. Mr. Szylkowski was overcharged for his 2021 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

32. Plaintiff Chiraag "CK" Patel is a resident of Suwanee, Georgia. On February 11, 2022, Plaintiff CK Patel purchased a new 2022 Honda Odyssey Elite from Gwinnett Place Honda in Duluth, Georgia for $59,388.81, primarily for personal, family, and household use. Mr. CK Patel's vehicle is still under an extended seven-year, 100,000-mile warranty.

33. Prior to his purchase, he relied on conversations with sales and service representatives at the Honda dealership and social media content (including from Facebook) concerning the vehicle, as well as his past experience owning a Honda minivan and Honda's brand reputation. None of the representations Mr. CK Patel received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

34. Mr. CK Patel believes airbags are important for safety and as part of the purchase of a vehicle. He has had Honda vehicles for many years, and the Honda Odyssey's multiple airbags were an important consideration in his decision to purchase his vehicle. To date, Mr. CK Patel's 2022 Honda Odyssey Elite has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. CK Patel is aware.

35. Mr. CK Patel would not have purchased his 2022 Honda Odyssey Elite had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Patel was overcharged for his 2022 Honda Odyssey Elite due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

36. Plaintiff John McLaughlin is a resident of Collinsville, Illinois. In 2022, Plaintiff McLaughlin purchased a used 2019 Honda Odyssey Touring from a Honda dealership in O'Fallon, Illinois for approximately $28,000, primarily for personal, family, and household use.

37. Prior to his purchase, he relied on Honda advertisements, conversations with sales representatives at the Honda dealership, Consumer Reports, and friends who had purchased Honda Odysseys. None of the representations Mr. McLaughlin received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

38. Mr. McLaughlin believes airbags are essential for safety. Safety was the central factor in Mr. McLaughlin's decision to purchase his Honda Odyssey. To date, Mr. McLaughlin's 2019 Honda Odyssey Touring has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. McLaughlin is aware.

39. Mr. McLaughlin would not have purchased his 2019 Honda Odyssey Touring had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. McLaughlin

Class Action Complaint – Case No. 26-cv-04431

was overcharged for his 2019 Honda Odyssey Touring due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

40.    Plaintiff Kyle Miller is a resident of Cary, Illinois. In 2021, Plaintiff Miller purchased a used 2019 Honda Odyssey EX-L from Audi of Hoffman Estates in Illinois for approximately $38,759, primarily for personal, family, and household use.

41.    Prior to his purchase, he reviewed information from the Audi dealership website (which was being fed from the Honda website) and the CARFAX concerning the 2019 Honda Odyssey EX-L. Mr. Miller also spoke to a sales representative at the Audi dealership concerning the vehicle's safety features, and he also relied on his own experience working as a service technician at a Honda dealership and in the automotive repair industry. None of the representations Mr. Miller received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

42.    The airbag safety features, especially the side airbags, on the 2019 Honda Odyssey EX-L were a major factor in Mr. Miller's decision to purchase the vehicle—particularly due to a previous car accident he had been injured in.

43.    Mr. Miller's 2019 Honda Odyssey EX-L has experienced the Spontaneous Airbag Deployment Defect. On August 3, 2024, Mr. Miller was driving himself, his wife, and his three young children from Gatlinburg, Tennessee back to their home in Illinois in his 2019 Honda Odyssey EX-L. As Mr. Miller was exiting an overbridge in rural Tennessee, he suddenly heard loud banging and popping noises as the entire left side driver and left rear airbags suddenly and inadvertently deployed. As a result, Mr. Miller and his family were stranded on the side of the road for approximately six hours until state troopers and an ambulance could arrive on the scene. As it was unfeasible to have the vehicle towed the distance of 500 miles from Tennessee to Illinois, the state troopers cut out the deployed airbags so that Mr. Miller could drive the car and his family back home to Illinois. Mr. Miller and his family thus traveled home in the Honda Odyssey without airbags on the left driver and left rear sides of the vehicle and with only half of the car gauges still functioning.

44.    Once back in Illinois, Plaintiff Miller took his 2019 Honda Odyssey EX-L to an automotive repair shop within his car insurance network to repair the damage caused by the inadvertent airbag deployment. At first, the automotive repair shop suspected that the inadvertent airbag deployment

7

could have been caused by loose suspension; however, the shop ruled out loose suspension as a potential cause after inspecting the vehicle and determining that the suspension was not defective. The automotive repair shop informed Plaintiff Miller that, based on its inspection of the vehicle, it rather believed that the airbag detector was faulty and therefore the cause of the inadvertent deployment.

45. The required repairs totaled $12,000, which included replacing the deployed side airbags, replacing the interior of the vehicle, and repairing damage to the steering wheel. Despite the fact that the vehicle had not been damaged as a result of a car collision or other covered event under the car insurance policy, Mr. Miller's car insurance company offered to pay and did pay $11,000 of the required repairs. Mr. Miller therefore paid $1,000 of the total repairs—his deductible under his car insurance policy. Plaintiff Miller also had to replace all three of the car seats that were in the Honda Odyssey at the time of the incident, which his car insurance offered to and did reimburse him for.

46. Mr. Miller would not have purchased his 2019 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Miller was overcharged for his 2019 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

47. Plaintiff Melissa Ryan is a resident of Inverness, Illinois. On October 31, 2019, Plaintiff Ryan purchased a 2019 Honda Odyssey EX-L from AutoNation Honda O'Hare in Des Plaines, Illinois for $36,669.56, primarily for personal, family, and household use.

48. Prior to her purchase, she invested a lot of time into researching, including by looking at reviews online. None of the representations Ms. Ryan received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

49. Ms. Ryan believes airbags are important for safety, and her vehicle purchase was based on her perception of the 2019 Honda Odyssey EX-L's safety for her family. To date, Ms. Ryan's 2019 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Ms. Ryan is aware.

50. Ms. Ryan would not have purchased her 2019 Honda Odyssey EX-L had she known about the Spontaneous Airbag Deployment Defect described in this Complaint. Ms. Ryan was overcharged for

8

Class Action Complaint – Case No. 26-cv-04431

his 2019 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

51.    Plaintiff Kylene Weaver is a resident of Indiana. On May 17, 2021, Plaintiff Weaver purchased a used 2018 Honda Odyssey Elite from Neil Huffman Honda in Clarksville, Indiana for $30,399, primarily for personal, family, and household use.

52.    Prior to her purchase, she talked to employees at the dealership and to her father about the vehicle. None of the representations Ms. Weaver received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

53.    Ms. Weaver believes airbags are important for safety and as part of the purchase of a vehicle. To date, Ms. Weaver's 2018 Honda Odyssey Elite has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Ms. Weaver is aware.

54.    Ms. Weaver would not have purchased her 2018 Honda Odyssey Elite had she known about the Spontaneous Airbag Deployment Defect described in this Complaint. Ms. Weaver was overcharged for her Honda Odyssey Elite due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

55.    Plaintiff Bradley Trinh is a resident of Richmond, Kentucky. In Summer 2021, Plaintiff Trinh purchased a new 2022 Honda Odyssey EX-L from Gates Honda in Richmond, Kentucky for approximately $42,000, primarily for personal, family, and household use.

56.    Prior to his purchase, he relied on online review from various websites and conversations with Honda dealership representatives as to the car's features. None of the representations Mr. Trinh received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

57.    Mr. Trinh believes airbags are important for safety. The airbag safety features, especially the side airbags, on the 2022 Honda Odyssey EX-L were a major factor in Mr. Trinh's decision to purchase the vehicle. To date, Mr. Trinh's 2022 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Trinh is aware.

58.    Mr. Trinh would not have purchased his 2022 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Trinh was overcharged for

his 2022 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

59.    Plaintiff Paurang Patel is a resident of Kentwood, Michigan. On July 7, 2019, Plaintiff Paurang Patel purchased a new 2019 Honda Odyssey EX-L from Fox Honda in Grand Rapids, Michigan for approximately $34,000, primarily for personal, family, and household use.

60.    Prior to his purchase, he relied on the Honda dealership's positive recommendation of the vehicle and on the Honda brand reputation. None of the representations Mr. Paurang Patel received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

61.    Mr. Paurang Patel believes airbags are important for safety. In fact, the extensive airbag safety systems in the 2019 Honda Odyssey EX-L were a factor in his decision to purchase the vehicle. To date, Mr. Paurang Patel's 2019 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Patel is aware.

62.    Mr. Paurang Patel would not have purchased his 2019 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Patel was overcharged for his 2019 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

63.    Plaintiff Sean Griffin is a resident of Omaha, Nebraska. In January 2026, Mr. Griffin purchased a used 2018 Honda Odyssey EX-L from Edwards Kia in Council Bluffs, Iowa for $24,517.92, primarily for personal, family, and household use.

64.    Prior to his purchase, he relied on conversations with sales representatives at the Edwards Kia dealership, Consumer Reports, and family and friends. None of the representations Mr. Griffin received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

65.    Mr. Griffin believes airbags are important for safety. Indeed, safety was Plaintiff Griffin's number one consideration when deciding to purchase the vehicle, along with reliability. To date, Mr. Griffin's 2018 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Griffin is aware.

66.    Mr. Griffin would not have purchased his 2018 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Griffin was overcharged

for his 2018 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

67.    Plaintiff Daniel Carr is a resident of Apex, North Carolina. On May 30, 2024, Plaintiff Carr purchased a used 2022 Honda Odyssey Touring from Smart Cars by Wieland in Pittsboro, North Carolina for $31,433.20, primarily for personal, family, and household use.

68.    Prior to his purchase, he reviewed the Honda website, YouTube videos, and online reviews concerning the vehicle. None of the representations Mr. Carr received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

69.    Mr. Carr believes airbags are important for safety. Safety and reliability were key considerations in his decision to purchase his Honda Odyssey, which is why he made sure not to purchase a rebuilt or salvaged model. To date, Mr. Carr's 2022 Honda Odyssey Touring has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Carr is aware.

70.    Mr. Carr would not have purchased his 2022 Honda Odyssey Touring at the price he paid had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Carr was overcharged for his 2022 Honda Odyssey Touring due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

71.    Plaintiff Clarkton Moore is a resident of Belville, North Carolina. In 2025, Plaintiff Moore purchased a used 2018 Honda Odyssey EX-L from Toyota of Rockhill in South Carolina for $22,348, primarily for personal, family, and household use.

72.    Prior to his purchase, he spent a good deal of time researching the vehicle. Specifically, Mr. Moore reviewed materials from the Honda website, car ratings from Auto Trader, Car and Driver, Consumer Reports, U.S. News and World Report, and YouTube videos. He also spoke with a salesperson at the Hendrick Honda dealership in Charlotte, North Carolina and with other car owners.  None of the representations Mr. Moore received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

73.    Mr. Moore believes airbags are very important for safety, and safety and reliability were major considerations when he purchased his 2018 Honda Odyssey EX-L. To date, Mr. Moore's 2018

Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Moore is aware.

74. Mr. Moore would not have purchased his 2018 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Moore was overcharged for his 2018 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

75. Plaintiff Sai Veerabrahma is a resident of Liberty Township, Ohio. In November 2019, while living in Westchester, Ohio, Plaintiff Veerabrahma purchased a new 2020 Honda Odyssey EX-L from North City Honda in Chicago, Illinois for approximately $38,000, primarily for personal, family, and household use.

76. Prior to his purchase, he relied on the Honda website, YouTube videos, and conversations with a sales representative at the Honda dealership. None of the representations Mr. Veerabrahma received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

77. Mr. Veerabrahma believes airbags are important for safety. Indeed, safety—and the numerous safety features advertised for the 2020 Honda Odyssey EX-L—was one of his foremost considerations when deciding to purchase this vehicle. To date, Mr. Veerabrahma's 2020 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Veerabrahma is aware.

78. Mr. Veerabrahma would not have purchased his 2020 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Veerabrahma was overcharged for his 2020 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

79. Plaintiff Zachary Kupec is a resident of Gibsonia, Pennsylvania. In October 2024, Mr. Kupec purchased a used 2019 Honda Odyssey EX-L from a private party for $25,000, primarily for personal, family, and household use.

80. Prior to his purchase, he relied on the Honda website, information from Carfax, and his confidence in the Honda brand from previously owning a Honda Odyssey. None of the representations

Class Action Complaint – Case No. 26-cv-04431

Mr. Kupec received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

81.    Mr. Kupec believes airbags are important for safety. To date, Mr. Kupec's 2019 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Kupec is aware.

82.    Mr. Kupec would not have purchased his 2019 Honda Odyssey EX-L at the price he paid had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Kupec was overcharged for his 2019 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

83.    Plaintiff Farooq Amlani is a resident of Irving, Texas. In October 2018, Mr. Amlani purchased a 2019 Honda Odyssey Elite from Dar Cars Honda in Bowie, Maryland for approximately $50,000, primarily for personal, family, and household use.

84.    Prior to his purchase, he reviewed materials online, talked to a neighbor who owned the same model, and spoke with employees at the dealership about the vehicle. None of the representations Mr. Amlani received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

85.    Mr. Amlani believes airbags are a very important part of the purchasing decision. To date, Mr. Amlani's 2019 Honda Odyssey Elite has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Amlani is aware.

86.    Mr. Amlani would not have purchased his 2019 Honda Odyssey Elite had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Amlani was overcharged for his 2019 Honda Odyssey Elite due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

87.    Plaintiff Casey Lee is a resident of Liberty Hill, Texas. On March 29, 2024, Plaintiff Lee purchased a used 2022 Honda Odyssey EX-L from Howdy Honda in Austin, Texas for $42,842.63, primarily for personal, family, and household use. Ms. Lee's 2022 Honda Odyssey EX-L is under extended warranty through Honda Care, valid through the earlier of June 1, 2029, or reaching 100,000 miles.

13

88.    Prior to her purchase, Ms. Lee conducted a good amount of research, including reviewing the Honda website's description of safety features and customer rating; speaking with the sales team at the Honda dealership concerning safety technology, incentives, and pricing; reviewing online third-party reviews; and viewing YouTube videos on performance. None of the representations Ms. Lee received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

89.    Ms. Lee believes airbags are very important for safety. In fact, the inclusion of side curtain and side airbag systems in the 2022 Honda Odyssey EX-L was a crucial factor in her decision to purchase the vehicle. Ms. Lee also trusted the Honda brand for safety and reliability, having owned four Honda vehicles prior to the 2022 Honda Odyssey EX-L. To date, Ms. Lee's 2022 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Ms. Lee is aware.

90.    Ms. Lee would not have purchased her 2022 Honda Odyssey EX-L had she known about the Spontaneous Airbag Deployment Defect described in this Complaint. Ms. Lee was overcharged for her 2022 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

91.    Plaintiff Melody Maynard is a resident of Azle, Texas. On December 12, 2023, Plaintiff Maynard purchase a used 2021 Honda Odyssey EX 3.5 from Dallas Motors in Garland, Texas, primarily for personal, family, and household use.

92.    Prior to her purchase, Ms. Maynard reviewed materials from Carmax, Carfax, Kelley Blue Book, and other websites, as well as recommendations from family.

93.    Ms. Maynard believes airbags are important for safety. To date, Ms. Maynard's 2021 Honda Odyssey EX 3.5 has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Ms. Maynard is aware.

94.    Ms. Maynard would not have purchased her 2021 Honda Odyssey EX 3.5 had she known about the Spontaneous Airbag Deployment Defect described in this Complaint. Ms. Maynard was overcharged for her 2021 Honda Odyssey EX 3.5 due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

Class Action Complaint – Case No. 26-cv-04431

95.    Plaintiff Feroz Khan Mohammed is a resident of Houston, Texas. In 2017, Plaintiff Mohammed purchased a new 2018 Honda Odyssey EX-L from Gilman Honda in Houston, Texas for $41,131.85, primarily for personal, family, and household use.

96.    Prior to his purchase, he reviewed the Honda website, spoke with an individual at the dealership, considered competitor minivans, and spoke with a friend concerning the 2018 Honda Odyssey EX-L. None of the representations Mr. Mohammed received or reviewed contained any disclosures relating to the Spontaneous Airbag Deployment Defect.

97.    Plaintiff Mohammed believes airbags are important for safety. To date, Mr. Mohammed's 2018 Honda Odyssey EX-L has not experienced an airbag deployment due to the Spontaneous Airbag Deployment Defect, as far as Mr. Mohammed is aware.

98.    Mr. Mohammed would not have purchased his 2018 Honda Odyssey EX-L had he known about the Spontaneous Airbag Deployment Defect described in this Complaint. Mr. Mohammed was overcharged for his 2018 Honda Odyssey EX-L due to the Spontaneous Airbag Deployment Defect and Honda's conduct and communications with respect to it, as alleged in this Complaint.

99.    Plaintiffs did not know when they purchased their Honda Odysseys that their airbags were defective and could malfunction (including by causing a safety hazard), that Honda had defectively designed the Class Vehicles, or that the Honda Odysseys they purchased were especially prone to spontaneous airbag deployment.

## II.    DEFENDANTS

100.    Defendant Honda Motor Co., Ltd. ("Honda Motor") was founded in 1948 under Japanese law, with its principal place of business located at Toranomon Alcea Tower 2-2-3 Toranomon, Minato-ku, Tokyo 105-8404, Japan. Honda Motor is an automaker and the parent corporation of Defendants American Honda Motor Company, Inc. and Honda Development & Manufacturing of America, LLC.

101.    Honda Motor designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Honda-branded vehicles and parts worldwide. It also provides American Honda Motor Company, Inc., Honda Development & Manufacturing of America, LLC, and its other United States subsidiaries with the technical information needed to manufacture, service, and repair the Class Vehicles.

102. Defendant American Honda Motor Company, Inc. ("American Honda") is a wholly owned subsidiary of Defendant Honda Motor. It is the sole authorized distributor of Honda and Acura motor vehicles, Honda motorcycles, Honda power equipment, and Honda and Acura parts and accessories in the United States. It is a California corporation with its principal place of business located at 1919 Torrance Boulevard, Torrance, California 90501.

103. In 1959, American Honda became the first overseas subsidiary of Honda Motor. Honda Motor made the decision to found and register American Honda as a California corporation and still controls virtually all of American Honda's operations—including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.

104. American Honda is responsible for sales, marketing, service, distribution, and manufacture of Honda branded products, including vehicles and parts, in the United States. American Honda is also the warrantor and distributor of Honda vehicles, including Class Vehicles, throughout the United States.

105. Defendant Honda Development & Manufacturing of America, LLC ("HDMA") is an Ohio limited liability company with its principal place of business located at 24000 Honda Parkway, Marysville, Ohio 43040.

106. HDMA is the entity that combines all of Honda's U.S. auto creation functions, including all of Honda's automobile manufacturing facilities in the U.S. concerning frames, engines, transmissions, related engineering and purchasing operations, and U.S.-based automobile product development operations. HDMA was formally created on April 1, 2021, when Honda unified previously diffuse manufacturing and product development operations in the United States.

107. HDMA is comprised of wholly or partially consolidated companies including Honda of America Mfg., Honda Manufacturing of Alabama, Honda Manufacturing of Indiana, Honda Transmission Manufacturing of America, Honda Precision Parts of Georgia, Honda Engineering North America, Honda R&D Americas and Honda Accessory America.

108. Honda Motor began manufacturing in the United States through its subsidiaries in 1979. It was the first Japanese automaker to build engines in the United States. Today, a majority of Honda

16

Class Action Complaint – Case No. 26-cv-04431

Odysseys are assembled at Honda's Lincoln, Alabama facility. Honda boasts twelve U.S. manufacturing plants in six states, including North Carolina, Indiana, Ohio, and Georgia.

109. As used in this Complaint, "Honda" refers collectively to all Defendants—which mirrors Honda's practice in its own public disclosures about its operations, actions, and structure, including in regulatory disclosures and filings. Where public information permits differentiation between subsidiaries/affiliates, this Complaint differentiates between Honda entities.

110. Honda subsidiary Honda R&D Innovations, Inc. maintains its principal place of business in this judicial district in Mountain View, California, and also maintains a physical office in San Jose, California (Honda Research Institute – Silicon Valley). There are also at least 45 Honda dealerships located within this judicial district. Honda directly employs 2,600 employees in California.

111. Honda sells vehicles in part via communications that it authorizes its dealers to make about Honda vehicles, including the Class Vehicles discussed herein. This includes authorizing Honda dealers to distribute brochures and other marketing and promotional material. Honda, through its authorized dealers, has and had the opportunity to disclose all material facts relating to the Class Vehicles, including the Spontaneous Airbag Deployment Defect.

112. Honda provides information to car buyers through agreements between Honda and its authorized dealers. Honda's logo is displayed at authorized dealerships; Honda issues technical bulletins and service instructions o dealerships detailing potential vehicle problems, and also relies on these dealerships to push software updates to customers' vehicles; Honda distributes various adverting and promotional materials it develops to its dealerships, including brochures, booklets, and pamphlets; and under the terms of its express warranty, Honda requires its customers to return to its authorized dealerships to perform warranty repairs.

**JURISDICTION AND VENUE**

113. This Court has personal and subject matter jurisdiction over all parties to and causes of action asserted in this Complaint.

114. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). At least one member of the proposed Classes is of diverse citizenship from Defendants Honda Motor, American Honda, and HDMA; the proposed Classes

17

consist of 100 or more members; and the aggregate claims of the members of the proposed Classes exceed $5 million, exclusive of interest and costs.

115. In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

116. This Court has personal jurisdiction over Honda America because Honda America's principal place of business is in the State of California, and Honda America is therefore subject to general jurisdiction in this State. Additionally, the conduct alleged in this Complaint occurred in and/or emanated from the State of California.

117. This Court has personal jurisdiction over Honda Motor and HDMA because they have minimum contacts with California, and otherwise intentionally avail themselves of the markets within California, through the promotion, sale, marketing, and distribution of their vehicles, so as to render the exercise of jurisdiction by this Court proper and consistent with traditional notions of fair play and substantial justice. Both Honda Motor and HDMA conduct substantial business in this district through or in participation with Honda America, and discovery will show significant conduct alleged in this Complaint occurred in and/or emanated from the State of California.

118. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. Honda, which has a substantial presence in this district, marketed, advertised, and sold the Class Vehicles throughout this district.

## DIVISIONAL ASSIGNMENT

119. Under Civil L.R. 3-2(c), this action can properly be assigned to any division in this district, as Honda advertised and sold the Class Vehicles in all three divisions. Further, Honda has an advanced technology research center (the Honda Research Institute) in San Jose.

**FACTS**

**I.    HONDA MARKETED THE CLASS VEHICLES AS SAFE AND RELIABLE FAMILY VEHICLES AND KNEW THESE ATTRIBUTES WERE MATERIAL TO CONSUMERS**

120.    Honda manufactures and sells the 2018, 2019, 2020, 2021, and 2022 Honda Odyssey (the "Class Vehicles").

121.    The Class Vehicles are marketed to consumers as safe, reliable vehicles, and Honda knew these qualities were material to consumers in marketing them in this manner. These qualities were material to Plaintiffs, and Honda had the opportunity to provide complete and truthful safety disclosures about the Class Vehicles.

122.    For example, in its press kit for the 2018 Honda Odyssey, Honda highlighted "Safety Features and Performance for the Family" including **"**Honda Sensing® suite of advanced safety and driver-assistive technologies as standard equipment, including Collision Mitigation Braking System (CMBS™), Lane Keeping Assist (LKAS), Road Departure Mitigation (RDM) and Adaptive Cruise Control (ACC). Combined with the Odyssey's next-generation Advanced Compatibility Engineering™ (ACE™) body structure and advanced airbags, including new driver and front passenger knee airbags, the Odyssey targets the highest available safety ratings – an NCAP 5-star Overall Vehicle Score and an IIHS *TOP SAFETY PICK* rating."

123.    The 2019, 2020, 2021, and 2022 Odyssey's "features by trim" pages on Honda's information center website note similar safety features to the 2018 model, including "3-row side curtain airbags with rollover sensor."

124.    Honda's press materials specifically highlighted the side curtain and side airbag systems— the very components at issue in this litigation. In its 2018 Odyssey press kit, Honda stated that "[a]ll outboard seating positions are protected by side curtain airbags with a rollover sensor system," and that "[i]n the event of a severe side impact, the side curtain airbags deploy from modules in the roof, providing a significant level of head protection in the window area."

125.    Honda separately described the side airbags as "designed to help provide pelvis and thorax protection for the driver and front passenger in the event of a severe side impact." Honda represented that "[t]he new 2018 Odyssey was designed to achieve top scores and best-in-class performance in all National Highway Traffic Safety Administration (NHTSA) and Insurance Institute for Highway Safety (IIHS)

19

crash tests." These representations were disseminated through Honda's press materials and were available to automotive journalists, reviewers, and through them, to consumers considering the purchase of a Class Vehicle. The press kits are also available online to consumers who access them directly through Honda's Newsroom website.

126. Honda's website also prominently features its safety philosophy "Safety for Everyone," which is intended to embody Honda's "commitment to protecting drivers, passengers, and pedestrians alike."



127. Honda's consumer-facing website reinforced these representations. On its dedicated safety page, Honda promoted its "Advanced Airbag Technology," stating: "Every Honda is equipped with advanced front airbags to help protect you in the event of a collision. Select models are also equipped with SmartVent® front side airbags, side curtain airbags with rollover sensor and front knee airbags to help provide further protection." This page was accessible to any consumer researching Honda vehicles and was part of the standard information available to prospective Class Vehicle purchasers.

128. Honda advertised its vehicles in this manner because it knew that safety was material to the average consumer. As the president of the Insurance Institute for Highway Safety ("IIHS"), an independent, nonprofit vehicle safety research organization, has noted—"[b]ack seat safety is important for all vehicles, but it's especially vital for those, like minivans, that customers are choosing specifically to transport their families."

129. Safety is one of the most important factors for consumers purchasing vehicles in the United States—and it is especially important for consumers purchasing family vehicles like minivans.

130. A 2010 IIHS consumer survey about vehicle choice found that 86 percent of respondents found safety to be very important when buying a new vehicle.

20

Class Action Complaint – Case No. 26-cv-04431

131. Honda's statements in its marketing materials demonstrate that Honda knew safety was material to the average customer. Honda had an opportunity to make complete safety-related disclosures in those and other marketing materials.

132. Honda targeted its marketing for the Class Vehicles directly at families through a massive, multi-channel advertising campaign. With the launch of the 2018 Honda Odyssey (ultimately launched June 2017, with marketing beginning in early 2017), Honda introduced a campaign titled "Keep the Peace," which per Honda's press release, "shares how the new Odyssey was developed for families and how the unique features of the vehicle can help keep the peace among children." This campaign debuted during the NHL and NBA Finals in mid-2017 and aired on 40-foot movie screens nationwide ahead of family films including *Despicable Me 3* (opened June 30, 2017), *Cars 3* (opened June 26, 2017), and *Captain Underpants* (opened June 2, 2017). Honda placed portal homepage takeovers on Yahoo!, MSN, and The Weather Channel. The campaign ran on national network cable and broadcast television, in lifestyle magazines, and included a partnership with Disney for a sweepstakes and an appearance at the D23 Expo. Honda also ran a Spanish-language television campaign on Univision, Telemundo, ESPN Deportes, and other networks.

133. At the time it released the new 2018 Honda Odyssey in mid-2017, the Odyssey had been the most popular minivan with individual American car buyers for seven years running. Honda sold the 2018 Odyssey and its other vehicles to consumers through over 1,000 independent U.S. Honda dealers nationwide.

134. Honda's consumer targeting for the Odyssey was not limited to parents broadly—it was specifically aimed at young families. When Honda debuted the 2018 Odyssey at the 2017 North American International Auto Show ("NAIAS") in January 2017, it highlighted in its press release that the Odyssey was "the most popular minivan with under-35 year old buyers in every year since 2010." Honda further touted that "American car buyers have purchased nearly 2.5 million Odyssey minivans since its 1994 debut." These statements, made at the outset of the Class Period, reflect Honda's awareness that the Odyssey's core consumers were young families who were choosing the vehicle specifically because of its reputation for safety and reliability.

21

Class Action Complaint – Case No. 26-cv-04431

135. Honda also boasted that the 2020 Honda Odyssey was named to *U.S. News & World Report*'s 2020 "Best Cars for Families" list in the Best Minivan category for the tenth year in a row. It noted that part of the consideration for vehicles named to that list were the safety ratings of the vehicles.

136. Honda further advertised its 2021 Honda Odyssey as having earned "the Insurance Institute for Highway Safety's (IIHS) highest accolade, the 2020 TOP SAFETY PICK+ (TSP+) rating." Honda touted, "It is the first minivan to be awarded with a 2020 TSP+ rating and the only minivan to earn a top rating for ease of use of its LATCH child seat attachment hardware."

137. Honda's safety marketing for the Odyssey continued and expanded throughout the Class Period. For the refreshed 2021 model year, Honda made its Honda Sensing suite of safety technologies standard on all Odyssey trims—not just EX and above—further centering safety in the Odyssey's value proposition. Honda announced that "[a]ll 2021 Honda Odyssey trims will come standard with the Honda Sensing® suite of safety and driver-assistive technologies." By that time, Honda stated that "American families have purchased more than 1.1 million Odyssey minivans" and that the "Odyssey has been America's #1 retail-selling minivan for 10 straight years." As detailed further below, Honda expanded its safety marketing even as there were consumer complaints about spontaneous airbag deployments in Class Vehicles.

138. Honda also used its own safety web pages to tell consumers that Honda's "Safety For Everyone" philosophy embodied its "commitment to protecting drivers, passengers and pedestrians alike," and that "[e]very Honda is equipped with advanced front airbags to help protect you in the event of a collision," while "[s]elect models are also equipped with . . . side curtain airbags with rollover sensor and front knee airbags to help provide further protection." These statements reinforced Honda's message that airbags, including side-curtain airbags, were protective features consumers could rely on.

139. Honda's 2021 marketing campaign further cemented the Odyssey's identity as the family vehicle of choice. On August 3, 2020—the same day the 2021 Odyssey went on sale—Honda launched its "Enchanted Odyssey" social media campaign, which it described as celebrating Honda's fifteenth consecutive year as "Official Vehicle of Disneyland® Resort." The campaign featured Disney characters including Mickey Mouse and Dumbo the Flying Elephant riding in the Odyssey's rear seats, and promoted the vehicle as Honda's "Ultimate Family Vehicle." Simultaneously, Honda promoted a new

22

"industry-first Rear-Seat Reminder system" integrated with the Odyssey's CabinWatch® rear-seat camera—describing it as "designed to prompt drivers to check their rear seating area before exiting the vehicle." Honda advertised this feature as available on all 2021 Odyssey trims.



140.    Honda's Disneyland Resort partnership was not a one-time promotion—it was a longstanding institutional relationship that Honda used throughout the Class Period to cement the Odyssey's brand identity as a family vehicle. Honda and Disney's alliance began in 2005 with Honda's sponsorship of the Disneyland Park fireworks, and by 2020 included sponsorship of the park's iconic Autopia attraction, which Honda had updated to be "Honda powered" and to feature Honda products and concepts throughout. Honda's press materials described this attraction—in which visitors drive a car on a winding road trip through Disneyland, displaying pictures of children playing with Disney stuffed animals in the very same rear seats of the Honda Odyssey where airbags may deploy without warning. Honda's decadeslong alliance with Disney, the most family-oriented entertainment brand in the world, further shows both the depth of Honda's family-vehicle marketing strategy and the centrality of family safety to its brand messaging.

141. Honda's safety representations for the Class Vehicles extended throughout the Class Period. On February 24, 2022, Honda announced that the 2022 Honda Odyssey had earned the IIHS TOP SAFETY PICK+ (TSP+) rating—the institute's highest accolade—for the second consecutive model year. In announcing the award, Honda stated that every fully tested Honda model, including the Odyssey, had earned a 5-Star Overall Vehicle Score from NHTSA, and specifically credited the Odyssey's "advanced supplemental restraint systems"—including "front, side, knee and side-curtain airbags"—as part of the vehicle's top safety profile.

142. Honda's own executives emphasized safety as central to the Odyssey's value proposition. Ray Mikiciuk, Honda's then-Assistant Vice President of Automobile Sales, said the "Odyssey was designed to keep everyone in the family happy, and helping to keep everyone safer is a crucial part of that mission." In the same press release, Honda described itself as having "a long history of leadership in the development and application of advanced technologies designed to enhance the safety of all road users" and as being "responsible for numerous pioneering efforts in the areas of crashworthiness, airbag technology, collision compatibility and pedestrian safety." As of the 2018 Odyssey, "standard safety equipment on all Honda models" included "side curtain airbags."

143. Honda also publicized its investment in crash-safety infrastructure. In press releases distributed across the Class Period, Honda stated that it "operates two of the world's most sophisticated crash-test facilities, in Ohio and Japan," and that these facilities supported its "commitment to contribute to a collision-free society"—a stated corporate goal Honda repeated in marketing materials for each of the Class Vehicle model years. By the 2021 model year, Honda publicly stated that "more than 3.5 million Honda vehicles on U.S. roads" were equipped with Honda Sensing, the company's suite of driver-assistive and safety technologies—a figure Honda used to underscore the breadth and reach of its safety marketing to consumers across the United States.

144. Among consumers purchasing a family car, a Kelly Blue Book New Vehicle-Buyer Attitude Study on Family Cars stated, "Safety is seen as the most important attribute among consumers when buying a family car." Honda's marketing of its minivans—classic family vehicles—reflects the company's knowledge that safety is material to consumers purchasing family autos.

Class Action Complaint – Case No. 26-cv-04431

145. The pervasiveness of Honda's safety marketing demonstrates both the materiality of safety to Class Vehicle purchases and that Honda had the means to disclose the Spontaneous Airbag Deployment Defect.

146. Honda's website, its network of over 1,000 dealerships, its national television and digital advertising, its press materials, and its in-cinema campaigns all reached the consumers who purchased Class Vehicles.

147. The same channels through which Honda communicated its safety representations are the channels through which it could and should have disclosed the Defect. Honda used these channels to affirmatively represent that the Class Vehicles' airbag systems were designed to protect families. It did not use them to disclose that those same airbag systems posed a risk of spontaneous deployment.

## II.    THE SPONTANEOUS AIRBAG DEPLOYMENT DEFECT

### A.    National Highway Traffic Safety Administration's Investigation

148. The National Highway Traffic Safety Administration ("NHTSA") is the federal agency responsible for keeping people safe on America's roadways.

149. Federal regulations require vehicle manufacturers producing 5,000 or more light vehicles annually, such as Honda, to comply with Early Warning Reporting requirements under the Transportation Recall Enhancement, Accountability, and Documentation Act of 2000 (the "TREAD Act"), 49 U.S.C. §§ 30101-30170.

150. Under the TREAD Act and its implementing regulations, all vehicle manufacturers are required by law to routinely monitor and analyze consumer complaints and other safety data to determine whether vehicles or components should be recalled due to safety concerns. This includes submitting reports to NHTSA quarterly that provide information on incidents involving death or injury. The regulations also hold manufacturers responsible "for any safety-related defect or any noncompliance determined to exist in the vehicle or in any item of original equipment."

151. NHTSA also allows consumers to file complaints which it reviews and investigates through its Office of Defects Investigation. Consumers' complaints are added to a public database and, if NHTSA receives similar reports from a number of people about the same product, it may open an investigation.

25

152. Prior to opening an investigation, NHTSA reviews and screens the complaints and analyzes any petitions calling for a defect investigation. If NHTSA determines an investigation is warranted, it will open one. The investigation will close if NHTSA doesn't identify a safety-related defect or if it notifies the manufacturer of the recall recommendations.

153. As has been reported to the NHTSA through numerous complaints and one Early Warning Reporting field and death & injury report, the side curtain and thorax airbags in the Class Vehicles have experienced and are overly susceptible to inadvertent deployment (the "Defect" or "Spontaneous Airbag Deployment Defect").

154. Under federal law, Honda is required to submit quarterly Early Warning Reports ("EWR") to NHTSA that provide information on incidents involving death or injury, as well as consumer complaints, property damage claims, warranty claims, and field reports related to potential defects. *See* 49 C.F.R. § 579.21. Honda's EWR obligations require it to aggregate and analyze this data. *Id.* As detailed below, consumer complaints regarding the Spontaneous Airbag Deployment Defect date back to at least May 2019. As part of its reporting and monitoring obligations, Honda should have been aware of and reported the Spontaneous Airbag Deployment Defect years before NHTSA opened its investigation in October 2025.

155. The NHTSA summary of the Defect states: "The complaints allege that the inadvertent deployments occurred while the vehicle was in motion. Consumers allege no warning prior to air bag deployment. Some allegations state that the deployment(s) occurred after traveling over a pothole or similar roadway feature. Inadvertent deployment of air bags while a vehicle is in motion can lead to injury of vehicle occupants or driver distraction, which may result in a collision."

156. On October 28, 2025, NHTSA opened a preliminary evaluation ("PE") to determine "the scope and severity of the potential problem and to fully assess the potential safety-related issues."

157. According to the NHTSA summary of the preliminary evaluation, the potential population of affected vehicles is 441,002.

158. The Early Warning Reporting field and death & injury report included one injury from this issue. Of the 18 complaints reported to NHTSA as of the PE opening, two reported injuries.

Class Action Complaint – Case No. 26-cv-04431

Additional complaints have been filed; Plaintiffs have identified at least 27 complaints in the NHTSA database in connection with this matter.

159.   Despite its knowledge of the Spontaneous Airbag Deployment Defect, Honda continued to design, manufacture, market, and sell Class Vehicles without disclosing the defect to consumers, without issuing a recall, and without modifying the SRS system to prevent spontaneous deployment.

**B.   The SRS System and How Side Airbags Work**

160.   Honda describes the side curtain airbag system as being made to "protect the seat occupant's head and neck in a side collision, preventing head impacts with the B-pillar or other parts of the vehicle." When deployed, the airbag "covers the side windows almost completely." According to Honda, there are ten impact centers in minivans that "enable optimal timing for actuation of side curtain and front seat i-side airbag systems according to the type of side collision." The below image depicts Honda's side curtain airbags when deployed.

161.   Thorax airbags are the side airbags that protect the torso during a collision. The image below depicts the structure of Honda's side airbags in both the front and the rear.



Class Action Complaint – Case No. 26-cv-04431



162.    The IIHS has noted on its website that the deployment of side airbags has been known to cause injuries.

163.    The Spontaneous Airbag Deployment Defect manifests through unexpected, improper, and dangerous airbag deployment. For example, as a result of the defect, airbags in Class Vehicles deploy after the vehicle encounters a minor road surface irregularity—such as a pothole, speed bump, or uneven pavement—at speeds and under conditions that do not involve any collision with another vehicle or object. Moreover, as a result of the defect, airbags deploy with no discernible external trigger at all: consumers have reported spontaneous deployment while driving on flat, smooth roads and even while the vehicle was stationary and being refueled.

164.    Deployment occurs without any prior warning light or dashboard indication; it is not preceded by any collision or impact with another vehicle or object; and it frequently involves the simultaneous deployment of multiple airbags—including side curtain airbags on one or both sides of the vehicle and side thorax airbags—rather than a single airbag. The simultaneous deployment of multiple airbags in the absence of a qualifying collision event is inconsistent with the intended operation of the SRS system.

165.    The precise root cause of the Spontaneous Airbag Deployment Defect is within Honda's exclusive knowledge. Honda designs, engineers, calibrates, and programs the SRS system in the Class Vehicles, including the crash sensors, the SRS electronic control unit, and the deployment algorithms that determine when airbags fire. Plaintiffs do not have access to Honda's sensor specifications, calibration

Class Action Complaint – Case No. 26-cv-04431

thresholds, crash algorithm logic, or internal engineering and testing data. Discovery in this action is expected to reveal the specific technical cause or causes of the defect.

166. What the consumer complaint record, which spans from May 2019 through at least January 2026, does establish is consistent patterns across all five model years of Class Vehicles. Consumers across the country—in Texas, Oklahoma, New York, Tennessee, Colorado, Illinois, Indiana, New Jersey, Georgia, West Virginia, North Carolina, and elsewhere—have reported the same defect in substantially identical terms. The geographic and temporal breadth of these reports is inconsistent with isolated manufacturing defects or localized road conditions and instead points to a systemic defect common to the Class Vehicles.

167. When airbags deploy spontaneously, the safety risks to vehicle occupants are serious. Consumers have reported burns from the force of deployment, temporary hearing loss and hearing damage (including to children), nausea and lightheadedness from the chemical fumes released by the airbag inflators, and temporary loss of visibility from the deployed curtain airbags blocking side windows and mirrors.

168. Consumers have described being unable to safely navigate to the shoulder of a highway after deployment. Following a spontaneous deployment, the SRS system is disabled, leaving the vehicle without functioning airbag protection until repaired—at a cost consumers report ranges from approximately $3,000 to $11,000. Honda has reportedly routinely denied warranty coverage for these repairs. These risks and costs are the very harms that diminish the value of every Class Vehicle, whether or not any particular vehicle has yet experienced a deployment.

169. Honda's own statements confirm that the SRS system in the Class Vehicles can deploy airbags in the absence of a collision. Honda told one consumer that "it is normal for airbag to activate even if there is no collision" and that "even a speed bump could activate the airbag." Honda told another consumer that "the air bag might deploy at 26 MPH." A Honda dealership documented in a service record that although there was "no physical evidence of a major impact," a pothole would have "more than likely" caused the deployment. These statements by Honda and its authorized dealers are consistent with a system that deploys airbags at force thresholds far below those associated with collision events warranting airbag protection.

Class Action Complaint – Case No. 26-cv-04431

III.    **CONSUMER REPORTS OF THE SPONTANEOUS AIRBAG DEPLOYMENT DEFECT**

170.    The Spontaneous Airbag Deployment Defect is not a theoretical risk. Consumers have been reporting it to NHTSA and Honda since at least May 2019. Plaintiffs identified at least 27 complaints in the NHTSA database from consumers describing inadvertent airbag deployment in Class Vehicles across all five model years. These complaints—a representative sample of which are reproduced below—describe a consistent pattern: airbags deploying without warning, without collision, and often after encountering minor road surface irregularities that would not trigger airbag deployment in any properly functioning vehicle.

171.    The latest model year affected is the 2022 Honda Odyssey, for which Plaintiffs identified the following complaint:

**Safety Issue Type: Complaints**
**March 08 2024**    NHTSA ID Number: 11576300
**Components: AIR BAGS**

NHTSA ID Number   11576300

Incident Date   November 03 2023

Consumer Location   RALEIGH, NC

Vehicle Identification Number   5FNRL6H81NB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | No | Tired popped and all side airbags deployed - no collision or accident. No damage to the car except the wheel. Children were in the car and could have been seriously injured from airbags that deployed when there was not a serious reason for them to deploy. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2022 |

172.    Complaints for the 2021 Honda Odyssey include:

**Safety Issue Type: Complaints**

**July 01 2022**   NHTSA ID Number: 11472051

**Components: AIR BAGS**

NHTSA ID Number   11472051

Incident Date   June 06 2022

Consumer Location   LANE, OK

Vehicle Identification Number   5FNRL6H86MB******

**Complaint Summary**

CRASH   No
FIRE   No
INJURIES   0
DEATHS   0

All passenger side curtain and front passenger seat airbag deployed for no reason while driving down an interstate. No collision. No impact of any kind. Honda denied any warranty d/t impact on tires on passenger side (there was no impact to tires, I have included pictures of the tires).

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2021 |

**Safety Issue Type: Complaints**

**August 13 2021**   NHTSA ID Number: 11429024

**Components: AIR BAGS**

NHTSA ID Number   11429024

Incident Date   August 13 2021

Consumer Location   BROOKLYN, NY

Vehicle Identification Number   5fnrl6h86mb************

**Complaint Summary**

CRASH   No
FIRE   No
INJURIES   0
DEATHS   0

The contact owns a 2021 Honda Odyssey. The contact stated that while driving at 35 MPH, the passenger's side curtain air bags deployed without incident and without warning. An automated security feature in the vehicle called him immediately upon deployment of the air bags. The contact was asked if he needed assistance from authorities and he informed them that he was ok. The contact was not injured during the failure. The contact was able to drive the vehicle home where it remained in his possession. The dealer nor the manufacturer had yet to be notified of the failure. The vehicle had yet to be repaired. The failure mileage was approximately 8,000.

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2021 |

Class Action Complaint – Case No. 26-cv-04431

173.    Complaints for the 2020 Honda Odyssey include:

**Safety Issue Type: Complaints**
**October 31 2025**    NHTSA ID Number: 11696794
**Components: AIR BAGS**

NHTSA ID Number    11696794

Incident Date    October 28 2022

Consumer Location    RALEIGH, NC

Vehicle Identification Number    5FNRL6H93LB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | No | Side airbags deployed while driving down road at about 35 mph hitting a minor bump in road. Air bags deployment while the car is in motion during safe driving conditions is a distraction to the driver and harms the passengers who are in the vehicle who if the airbags did not deploy would have remained safe since no collision was experienced. Took vehicle to Honda dealership- who stated airbags worked as intended and we needed to file a collision claim with insurance- despite no collision taking place and no other damage to the car i.e. no bent rim or flat tire/tire damage. Just saw article stating our scenario was not unique to our make/model of van. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2020 |

**Safety Issue Type: Complaints**
**March 12 2025**    NHTSA ID Number: 11647837
**Components: AIR BAGS**

NHTSA ID Number    11647837

Incident Date    February 02 2025

Consumer Location    SPRING VALLEY, NY

Vehicle Identification Number    5FNRL6H55LB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | Yes | The contact owns a 2020 Honda Odyssey. The contact stated that while driving during a snow day at approximately 15 MPH, the vehicle lost traction and crashed into a curb on the front driver's side where it came to a stop. The crash was minor. No property damage was on the curb. The air bags deployed with excessive force. No injuries were sustained. The vehicle was taken to a local independent dealer where it was diagnosed that an air bag replacement was needed. The local dealer was not contacted. The vehicle was repaired cosmetically by the insurance provider. The contact believed that the impact to the curb was minor and equivalent to going over a pothole which should not have warranted an air bag deployment. The manufacturer was notified of the failure. The failure mileage was approximately 93,000. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2020 |

**Safety Issue Type: Complaints**

**May 01 2025**   NHTSA ID Number: 11658177

**Components: AIR BAGS**

NHTSA ID Number   11658177

Incident Date   April 23 2025

Consumer Location   OVERLAND PARK, KS

Vehicle Identification Number   5FNRL6H77LB******

**Complaint Summary**

CRASH   No
FIRE   No
INJURIES   0
DEATHS   0

The contact owns a 2020 Honda Odyssey. The contact stated that while driving 10 MPH, the air bag unexpectedly deployed. There was no crash that caused the air bag to deploy. A dealer was contacted. The vehicle was towed to the dealer, and the contact was informed that due to cosmetic impacts with the hood and the bumper, a determination as to why the air bag had deployed. The dealer referred the contact to the Insurance Company for assistance. The vehicle was not repaired. The manufacturer was notified of the failure and opened a case. The approximate failure mileage was 68,000.

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| HONDA | ODYSSEY | 2020 |

---

**Safety Issue Type: Complaints**

**August 19 2025**   NHTSA ID Number: 11681560

**Components: AIR BAGS**

NHTSA ID Number   11681560

Incident Date   February 02 2025

Consumer Location   SPRING VALLEY, NY

Vehicle Identification Number   5FNRL6H55LB******

**Complaint Summary**

CRASH   No
FIRE   No
INJURIES   0
DEATHS   0

While driving at approximately 12 mph on slightly snowy roads, my vehicle slipped and made a light impact with the sidewalk curb. Despite the minor nature of the collision, the entire left-side curtain airbag and seat airbag deployed with full force, as if a severe accident had occurred. This deployment was unexpected and excessive given the low-speed impact. I have found multiple online reports of similar incidents involving premature or overly sensitive airbag deployment in Honda vehicles, which raises concerns about a potential safety defect. Concern: I believe this may indicate a flaw in the airbag deployment system or sensor calibration. This poses a safety risk and could result in unnecessary injuries or repair costs

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| HONDA | ODYSSEY | 2020 |

33

174. Complaints for the 2019 Honda Odyssey include:

**Safety Issue Type: Complaints**
**February 07 2025**   NHTSA ID Number: 11641347
**Components: AIR BAGS**

NHTSA ID Number   11641347

Incident Date   March 22 2023

Consumer Location   CHICAGO, IL

Vehicle Identification Number   5FNRL6H29KB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | Yes | The contact owns a 2019 Honda Odyssey. The contact stated that while driving at 25 MPH over a pothole, the driver-side air bag and the driver-side curtain air bags in the headliner were deployed. The contact stated she did not depress the brake pedal, however, for an unknown reason the vehicle stalled. The contact stated multiple unknown warning lights were illuminated. White smoke was emitting from an unknown source inside the vehicle. There were no injuries sustained. A police report was filed. The vehicle was taken to the dealer where it was diagnosed however, the failure was undetermined. The air bags were replaced. The insurance company was contacted and the vehicle was towed to the insurance company however, no inspection was completed. The manufacturer was not made aware of the failure, and the contact was referred to her insurance company. The failure mileage was 59,274. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2019 |

**Safety Issue Type: Complaints**
**April 21 2024**   NHTSA ID Number: 11584332
**Components: AIR BAGS**

NHTSA ID Number   11584332

Incident Date   April 20 2024

Consumer Location   Unknown

Vehicle Identification Number   5FNRL6H8XKB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | No | While operating the vehicle on a highway, under normal weather conditions the vehicle was traveling at a normal rate of speed while Side airbag curtains on both, drivers and passengers side, spontaneously deployed. There was no collision with any vehicle or object to cause deployment.   Side airbags caused temporary visual and hearing impairment from deployment making vehicle operation on highway extremely dangerous to safely navigate to shoulder of highway to a place of safety.   The side curtain airbags blocked side mirrors and all side widows. Unable to see out of vehicle to navigate to shoulder of highway.   There is no external damage to vehicle. There were no indication lights warning of an airbag system issue.   Vehicle is currently at a Honda service center awaiting appointment to assess vehicle. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2019 |

34

**Safety Issue Type: Complaints**

**April 25 2025**    NHTSA ID Number: 11656852

**Components: AIR BAGS**

NHTSA ID Number    11656852

Incident Date    April 07 2025

Consumer Location    WHITESTOWN, IN

Vehicle Identification Number    5FNRL6H76KB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | No | The contact owns a 2018 Honda Odyssey. The contact stated while driving at an undisclosed speed, the contact drove over a pothole and the front passenger's side curtain air bag deployed unintendedly. No warning light was illuminated. The vehicle was towed to an independent mechanic; however, the vehicle was not diagnosed. The vehicle was not repaired. The manufacturer was not made aware of the failure. The failure mileage was approximately 100,000. The VIN was not available. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2019 |

**Safety Issue Type: Complaints**

**June 03 2025**    NHTSA ID Number: 11664624

**Components: AIR BAGS**

NHTSA ID Number    11664624

Incident Date    May 11 2025

Consumer Location    BEDFORD, MA

Vehicle Identification Number    5FNRL6H70KB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | No | Well driving on the highway in CT. I hit a pot hole and the drive side curtain airbags deployed. There was no accident, but my kids were freaked out. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2019 |

35

Class Action Complaint – Case No. 26-cv-04431

**Safety Issue Type: Complaints**

**August 20 2025** NHTSA ID Number: 11681984

**Components: AIR BAGS**

NHTSA ID Number  11681984

Incident Date  July 01 2025

Consumer Location  IRVING, TX

Vehicle Identification Number  5FNRL6H73KB******

**Complaint Summary**

CRASH  No
FIRE  No
INJURIES  0
DEATHS  0

On July 1st 2025, while driving in Raton, New Mexico, my 2019 Honda Odyssey EX-L experienced a spontaneous deployment of the driver-side curtain airbag. I was exiting the highway and slowing down to a stop sign (approx. 30 mph) when the airbag deployed. There was no crash, no impact, and no obstacle.  This deployment disabled the entire SRS system, leaving the vehicle unsafe. My family — including three children — were in the car. I received a minor airbag burn on my arm, which healed in 24 hours. The SRS light came on only afterwards.  There is zero exterior or interior damage. I recorded a video immediately after. The certified collision center at David McDavid Honda (Irving, TX) inspected the vehicle and confirmed in writing that there was no sign of collision. They sent me $11,000 repair (attached).  I opened a case with American Honda on Monday, July 7th 2025 and I have not heard back since.  The vehicle and components are available for inspection. I've since found multiple reports of similar airbag deployments in 2018–2020 Honda Odysseys, including:  •  https://www.odyclub.com/threads/2019-honda-odyssey-elite-random-air-bag-deployment.380737/  •  https://www.odyclub.com/threads/random-airbag-deployment.382243/  •  https://www.odyclub.com/threads/side-curtain-airbags-deployed-w-out-collision.366424/  This appears to be a pattern of spontaneous deployment and SRS failure that poses serious safety risk and warrants investigation.

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2019 |

**Safety Issue Type: Complaints**

**October 31 2025** NHTSA ID Number: 11696732

**Components: AIR BAGS**

NHTSA ID Number  11696732

Incident Date  September 12 2025

Consumer Location  RICHMOND HILL, GA

Vehicle Identification Number  5FNRL6H72KB******

**Complaint Summary**

CRASH  No
FIRE  No
INJURIES  0
DEATHS  0

The contact owns a 2019 Honda Odyssey. The contact stated that while driving 65 MPH on the highway and driving over a bump in the road, the side curtain air bags and the passenger's seat air bag deployed. The contact linked the failure to NHTSA Action Number: PE25018 (Air Bags). There were no reported injuries. The local dealer was not contacted. The vehicle was not diagnosed or repaired. The vehicle was taken to a collision center, which determined there was no impact to the vehicle or internal failure. The manufacturer was contacted and confirmed that the air bag might deploy at 26 MPH. The failure mileage was approximately 110,000.

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2019 |

36

Class Action Complaint – Case No. 26-cv-04431

175.    The 2018 Honda Odyssey—the first model year affected—has generated the most complaints:

---

**Safety Issue Type: Complaints**

**July 08 2022**    NHTSA ID Number: 11472900

**Components: AIR BAGS**

NHTSA ID Number    11472900

Incident Date    June 27 2022

Consumer Location    MILFORD, MI

Vehicle Identification Number    5FNRL6H99JB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | No | The contact owns a 2018 Honda Odyssey. The contact stated while driving 40 MPH, the passenger's side air bags deployed without warning or a crash. The contact was able to pull over safely. The contact's daughter was injured and taken to the hospital to seek medical assistance. The vehicle was towed to a Collison Center and then towed to the dealer. The dealer and the manufacturer were contacted and notified the contact of a hole under the subframe of the vehicle. The contact was informed that the repair would be an out-of-pocket expense. The failure mileage was 135,000. |
| FIRE | No | |
| INJURIES | 1 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2018 |

---

**Safety Issue Type: Complaints**

**July 02 2024**    NHTSA ID Number: 11598283

**Components: AIR BAGS**

NHTSA ID Number    11598283

Incident Date    June 04 2024

Consumer Location    HIGHLAND PARK, IL

Vehicle Identification Number    5FNRL6H53JB******

**Complaint Summary**

| | | |
|---|---|---|
| CRASH | Yes | was driving in a rainstorm, a storm drain cap was pushed up and popped rear passenger tire. set off ALL passenger side airbags. I have a police report, numerous photos and videos. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| HONDA | ODYSSEY | 2018 |

---

37

**Safety Issue Type: Complaints**

**February 10 2025**    NHTSA ID Number: 11641846

**Components: AIR BAGS**

NHTSA ID Number   11641846

Incident Date   January 14 2025

Consumer Location   METUCHEN, NJ

Vehicle Identification Number   5FNRL6H72JB******

**Complaint Summary**

CRASH   No

FIRE   No

INJURIES   0

DEATHS   0

The airbag system malfunctioned, causing the airbags to deploy unexpectedly while driving. The vehicle is currently at the Honda dealer for repairs and the airbags, as well as related components, are available for inspection upon request.   The unexpected deployment of the airbags posed a significant safety risk. It startled me, which impaired my control of the vehicle suddenly as I was driving on the highway. Afterwards, I noticed fumes in the vehicle and I began feeling nauseous and light headed. I managed to pull over on the highway and stepped out of the vehicle.  This could have led to a loss of control of vehicle, increasing the risk of collision or injury to not only myself but others on the road as well.  The problem has not been reproduced or confirmed by a dealer or independent service center yet. However, my insurance appraiser inspected the vehicle immediately after the incident and confirmed that the airbags deployed without any signs of a collision or impact. The cause of the deployment remains unknown, and the appraiser recommended that Honda investigate the issue further to identify any potential malfunction in the airbag system.  The issue has been inspected by my insurance appraiser, who concluded that while the airbags deployed, there were no visible signs of a collision or any impact that would typically trigger airbag deployment. The inspection of the vehicle's exterior panels, undercarriage, and suspension showed no signs of damage. The cause of the airbag deployment is unknown, and the appraiser recommended that Honda investigate further to determine if a malfunction within the vehicle's airbag system is responsible. I believe Honda is at fault, as this issue appears to be related to a malfunction that they need to address.   There were no warning lamps, messages, or symptoms prior to the airbag deployment. However, after the airbags deployed, warning lights appeared on the dashboard, indicating a potential issue.

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| HONDA | ODYSSEY | 2018 |

38

Class Action Complaint – Case No. 26-cv-04431

**Safety Issue Type: Complaints**

**March 17 2025**   NHTSA ID Number: 11648628

**Components: AIR BAGS**

**NHTSA ID Number**   11648628

**Incident Date**   September 08 2024

**Consumer Location**   KATY, TX

**Vehicle Identification Number**   5FNRL6H74JB******

**Complaint Summary**

CRASH   No
FIRE   No
INJURIES   0
DEATHS   0

During a normal drive on city road, the right side airbag and copilot passenger seat airbag both activate with no collision or agitation of the vehicle. Vehicle was sent to dealership for inspection; data transmitted to Honda USA. Honda USA replied that it is normal for airbag to activate even if there is no collision; Honda said even a speed bump could activate the airbag. Honda has refused to investigate further or compensate my repair. During the incident, the car was not going through any speed bump; it was just on a normal flat city road. There was no prior warning signs in the car. It could have caused significant personal injuries had my kids were sitting next to the airbag explosion because the bags activated with.no collision; there is no counterforce to the airbag thus it would thrust straight into a person. Luckily my kids were not in those seats at the time. It took so long to file to NHTSA because Honda had been very unresponsive after hearing my case, it took Honda half a year to inform me they are not doing any corrections or compensation to this incident.

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| HONDA | ODYSSEY | 2018 |

**Safety Issue Type: Complaints**

**July 31 2025**   NHTSA ID Number: 11677666

**Components: AIR BAGS**

**NHTSA ID Number**   11677666

**Incident Date**   July 22 2025

**Consumer Location**   LOCUST GROVE, GA

**Vehicle Identification Number**   5FNRL6H59JB******

**Complaint Summary**

CRASH   No
FIRE   No
INJURIES   0
DEATHS   0

Incident Timeline – Spontaneous Airbag Deployment  Date: July 22, 2025 Vehicle: 2018 Honda Odyssey EX-L Registered Owner: [XXX]  Driver at Time of Incident: [XXX]  Location of Incident: [XXX]  (just before the daycare) Primary Dealership Contact: Jasmine – Sons Honda Service Department Contacts [XXX] : Work: [XXX]  Secondary number Personal phone: [XXX] Email: [XXX]  [XXX]  [XXX]  Email:  ~2:27 PM – 2:32 PM – Airbag Deployment ·While driving on [XXX] , just prior to reaching the daycare, all airbags deployed spontaneously. ·confirmed no pothole, impact, or object collision occurred. · [XXX]  pulled the vehicle over safely, and all passengers were confirmed to be unharmed.  2:32 PM – Initial Phone Call · [XXX] contacted [XXX]  at 2:32 PM, placing the deployment within five minutes prior.  Shortly After – Police Department Notified ·The local police department was contacted to report the incident and ensure documentation and safety at the scene.  3:14 PM – Sons Honda Contacted · [XXX]  called the Sons Honda service and recall department to report the deployment and request inspection. ·Jasmine Cooper at Sons Honda is the primary representative handling the case. 678-345-8396 is our current service number for her - or the main number is 770-228-2888  ~3:45 PM – Insurance Company Notified · [XXX]  called the insurance company to initiate a claim and report the spontaneous airbag deployment. ·The claim process is ongoing pending diagnostic results from the dealership.  Towing & Vehicle Transport ·Tow operator Isaiah initially proposed moving the vehicle to a tow lot. · [XXX]  requested the vehicle be taken directly to Sons Honda to avoid a second transfer. ·Isaiah mentioned an additional fee, which [XXX]  approved. ·A discounted tow charge was given, waiting on a call from the office to confirm total and process paym INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

**Affected Products (1)**

**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| HONDA | ODYSSEY | 2018 |

39

```
Safety Issue Type: Complaints
May 17 2019   NHTSA ID Number: 11208252
Components: AIR BAGS

NHTSA ID Number   11208252

Incident Date   May 10 2019

Consumer Location   NEWARK, DE

Vehicle Identification Number   5FNRL6H99JB******


Complaint Summary

CRASH    No    THE RIGHT SIDE AIRBAGS AND CURTAIN AIRBAGS DEPLOYED FOR NO
FIRE     No    REASON WHILE MY FAMILY WAS DRIVING.
INJURIES  0
DEATHS   0

Affected Products (1)

Vehicle
```

| MAKE  | MODEL   | YEAR |
|-------|---------|------|
| HONDA | ODYSSEY | 2018 |

176.    The NHTSA complaints are only part of the picture. Consumers also reported the Spontaneous Airbag Deployment Defect on popular Honda Odyssey online forums, further demonstrating the breadth of the problem and Honda's awareness of it.

177.    One such thread titled "Random airbag deployment" began on May 10, 2025, with the poster stating the following:

> Going through a weird situation. Honda Odyssey Touring (2018) passenger-side airbags deployed without any impact or internal/external damage while I was driving, probably at 35-40 miles per hour. Just like that. Honda investigated but claimed they couldn't find any reason and refused assistance. Statefarm [*sic*] is not accepting the insurance claim because there is no crash occurred. Looks like I have to get it repaired, paying out of pocket. Has anyone else gone through a similar scenario?

Class Action Complaint – Case No. 26-cv-04431

178.    The poster also included the diagnostic slip from the Honda dealership which confirmed that there was "no physical [evidence] of a major impact, it is more than likely that going over/hitting a pothole would have deployed the airbags."



179.    On August 6, 2025, another poster, BilPalTX, stated that this had also happened to them.



Class Action Complaint – Case No. 26-cv-04431

180.    On another OdyClub thread titled "Side curtain airbags deployed w/out collision" which began on November 24, 2021, the poster stated, in relevant part:

> Over the weekend, I was driving my 2021 EX converted for wheelchair access by Vantage Mobility International and l, as I went over a bump (not a speed bump) in a store parking lot, the side curtain airbags on both passenger    and    driver's    sides    deployed    for    no    reason.
>
> The vehicle was towed to the nearest Honda dealership and, after their initial inspection, they believe something don't [*sic*] to the van during the conversion                    caused                    the                    issue.
>
> They said that there's a code for the airbags deploying but not a code for why they deployed. Is that an accurate statement or they just telling me a story because they want to pin this on the conversion company? I realize that this is going to be quite expensive as each airbag is between $1k-$1500. I'm sure the headliner will need to be replaced as well as it is all out of shape now.

181.    The poster included images of the airbag deployment:



182.    Other posters on the thread noted that they had heard of this happening with other vehicles. One even stated that they "just saw another van, maybe 2019, at the dealer this morning that had the side bags popped and no visible damage.. huh." One poster, joregarciamkt, explained in a Spanish language post that this had also occurred in his 2019 Odyssey after he hit a pothole.

42

183.    On May 10, 2025, a Reddit thread began in the r/HondaOdyssey forum describing a similar issue:

> **r/HondaOdyssey** · 6mo ago
> ssevener
>
> **Anyone have experience with airbag deploying without collision???**
>
> 2018 Odyssey Touring - side curtain airbag went off when my wife hit a pothole this afternoon. I haven't talked to insurance or the dealership yet, just wondering if anyone else has seen this happen and if Honda saw it as a defect.

184.    Other commenters on the Reddit thread noted having experienced the same issue.

185.    The Spontaneous Airbag Deployment Defect has resulted in injuries to vehicle occupants, including children. On December 31, 2025, the side curtain airbags on the passenger side of a 2019 Honda Odyssey "deployed spontaneously while driving at highway speeds," and "[t]he explosion damaged the hearing of the driver and two children in the car." The consumer reported that the driver "retain[ed] full control of the vehicle despite the deafening explosion, release of noxious fumes, and unexpected loss of side visibility."

186.    The side curtain airbags that Honda represented would "provid[e] a significant level of head protection" for occupants in "all outboard seating positions"—including the rear seats where children ride in the Odyssey, a vehicle Honda marketed specifically to families—are the same airbags that spontaneously deployed and injured these children.

187.    In another incident, on August 8, 2024, a consumer reported that a 2020 Honda Odyssey hit a pothole "on a city street going 30-35" miles per hour, "and it caused the airbags on both sides of the van to deploy." The consumer reported "[t]here was no damage to the van, rim, or tire" and that "when the passenger airbag deployed my wife received a burn on her arm."

188.    On April 20, 2024, a consumer reported that while operating a 2019 Honda Odyssey on a highway "under normal weather conditions," the "[s]ide airbag curtains on both, drivers and passengers side, spontaneously deployed" with "[n]o collision with any vehicle or object." The consumer stated the deployment caused "temporary visual and hearing impairment" making "vehicle operation on highway extremely dangerous to safely navigate to shoulder of highway to a place of safety."

43

## IV.    HONDA'S KNOWLEDGE OF THE DEFECCT

189.    Honda knew about the Spontaneous Airbag Deployment Defect before Class Vehicles went to market. At the very least, Honda knew of the Spontaneous Airbag Deployment Defect well before NHTSA's investigation began as evidenced by: (1) the rigorous pre-launch testing of the Class Vehicles, including Honda's testing at what it calls "two of the world's most advanced crash-test facilities"; (2) the complaints consumers filed about the Spontaneous Airbag Deployment Defect with NHTSA beginning in May 2019; (3) consumers contacting Honda directly about the Spontaneous Airbag Deployment Defect starting in 2019; and (4) Honda's own Early Warning Report submissions to NHTSA, including field reports originating from within Honda's own organization.

### A.    Honda's Testing

190.    Honda touts its commitment to safety, including by claiming to have "developed two of the world's most advanced crash-test facilities — including the largest ever built and first to allow multi-directional crashes."

191.    Honda not only deploys crash tests, but has vigorous quality control processes for its vehicles prior to beginning mass production as shown in the diagram below:



192.    This quality control process includes long-term reliability testing and disassembling vehicles used in test drives through a process consisting of thousands of checks.

193.    For airbags specifically, Honda notes that it "constantly strives for improvements in protection and impact mitigation performance by accumulating know-how through the examination of actual accidents and extensive simulation and crash testing."

194.    Under U.S. federal law, Honda must also comply with the airbag standards established by the National Highway Traffic Safety Administration ("NHTSA") under Federal Motor Vehicle Safety Standard ("FMVSS") No. 208, 49 C.F.R. § 571.208.

195.    Because the Class Vehicles underwent such thorough durability testing, it is implausible that Honda did not know about the Spontaneous Airbag Deployment Defect before the Class Vehicles were sold to Plaintiffs and members of the Classes.

**B.      Consumer Complaints Related to Class Vehicles and Honda's Own Investigations**

196.    According to the Part 573 Safety Recall Report submitted by Honda to NHTSA, discussed further below, Honda received notification of an incident involving the defect and began investigating it as early as November 15, 2017. This report also states that by at least July 2021, Honda's investigation revealed the Defect, yet it did not issue a recall or otherwise remedy the issue.

197.    As early as May 17, 2019, NHTSA had already received a complaint about the Spontaneous Airbag Deployment Defect in the 2018 Honda Odyssey model. *See* NHTSA ID No. 11208252. Additional complaints followed in subsequent years with the first NHTSA complaint regarding the 2021 model on August 13, 2021 (NHTSA ID No. 11429024), the 2019 model on May 18, 2023 (NHTSA ID No. 11522625), and the 2022 and 2021 models in the spring of 2024 (NHTSA ID Nos. 11608011 and 11576300).

198.    Numerous NHTSA complaints also reference contacting Honda prior to filing the complaint itself and reference Honda investigations of the Spontaneous Airbag Deployment Defect. *See, e.g.*, NHTSA ID Nos. 11597187 (June 27, 2024 – "The manufacturer was made aware of the failure but offered no assistance"); 11648628 (March 17, 2025 – "Vehicle was sent to dealership for inspection; data transmitted to Honda USA. Honda USA replied that it is normal for airbag to activate even if there is no collision; Honda said even a speed bump could activate the airbag. Honda has refused to investigate further or compensate my repair. During the incident, the car was not going through any speed bump; it was just on a normal flat city road."); 11658177 (May 1, 2025 – "The manufacturer was notified of the failure and opened a case"); 11681984 ("I opened a case with American Honda on Monday, July 7th, 2025").

199.    The May 2025 OdyClub post titled "Random airbag deployment" also stated that "Honda investigated but claimed they couldn't find any reason and refused assistance."

200.    In another instance, a consumer reported to NHTSA in July 2022 that all passenger side curtain and front passenger seat airbags deployed in a 2021 Honda Odyssey "for no reason while driving down an interstate" with "[n]o collision" and "[n]o impact of any kind." Honda denied warranty coverage, attributing the deployment to "impact on tires on passenger side" despite the consumer's photographic evidence showing no tire damage.

201.    Honda was told directly by consumers about the defect and refused to act. In August 2020, a consumer reported that airbags in a 2020 Honda Odyssey deployed after hitting a small pothole at approximately 2–3 miles per hour. Honda told this consumer that "this is [his] fault and that their airbag system only deploys when it should."

202.    Honda's Early Warning Report submissions are particularly significant. Under 49 C.F.R. § 579.25, EWR "field reports" are specifically defined as reports "prepared by or for" the manufacturer concerning alleged malfunctions that are "identified by a manufacturer's employee or representative as involving a possible defect." Unlike consumer complaints filed directly with NHTSA, field reports originate from within the manufacturer's own organization—from Honda employees, dealers, or suppliers. Honda's submission of at least one field report regarding inadvertent airbag deployment in Class Vehicles thus confirms that someone within Honda's own network formally identified the spontaneous deployment pattern as a possible defect.

203.    Honda's own diagnostic systems further demonstrate its knowledge of—and failure to investigate—the Spontaneous Airbag Deployment Defect. As early as November 2021, a consumer reported on the OdyClub owner forum that after the side curtain airbags in a 2021 Honda Odyssey deployed while driving over a bump in a store parking lot, the Honda dealership told the consumer that its diagnostic system showed "a code for the airbags deploying but not a code for why they deployed."

204.    Honda's diagnostic system was thus recording unexplained airbag deployment events at least as early as 2021. Rather than investigating why its own system could not determine a cause for these deployments, Honda and its dealers instead sought to blame a vehicle's aftermarket wheelchair

46

conversion—and, in other cases, to blame consumers for encountering potholes, speed bumps, and other ordinary road conditions.

205.    The uniformity of Honda's responses to consumers reporting the Spontaneous Airbag Deployment Defect further demonstrates corporate-level awareness and a deliberate decision not to investigate or remedy the defect. Across different dealerships, in different states, over a period of years, Honda's responses followed a consistent pattern: attribute the deployment to an external cause such as a pothole or tire impact, deny warranty coverage, and direct the consumer to file an insurance claim.

206.    For example, Honda denied warranty coverage for a 2021 Odyssey by attributing the deployment to "impact on tires on passenger side" despite the consumer's photographic evidence showing no tire damage; a Honda dealership told a 2020 Odyssey owner that the airbags "worked as intended" and to "file a collision claim with insurance" despite no collision; Honda blamed a "hole under the subframe" of a 2018 Odyssey whose passenger airbags deployed at 40 MPH without a crash, injuring the owner's daughter, and told the owner the repair was "an out-of-pocket expense"; and Honda told a 2018 Odyssey owner that "it is normal for airbag to activate even if there is no collision" and that "even a speed bump could activate the airbag." This uniform pattern of denial and deflection across multiple years and locations is inconsistent with isolated incidents and is instead consistent with a corporate-level policy decision to deny the defect rather than investigate or remedy it.

207.    Honda's internal case management system also confirms its awareness. Multiple consumers report that Honda "opened a case" regarding their spontaneous deployment incidents. One consumer reported that he "opened a case with American Honda on Monday, July 7th 2025" but that he had "not heard back since." Another reported that "[t]he manufacturer was notified of the failure and opened a case." A third reported that "it took Honda half a year to inform me they are not doing any corrections or compensation to this incident." Honda seems to have maintained a centralized system for tracking spontaneous deployment reports, had an aggregated view of the defect pattern that no individual consumer possessed, and after deliberation chose not to act.

208.    In addition to consumer complaints, Honda was required under 49 C.F.R. § 579.24 to track and report warranty claims and adjustments related to the components at issue—including airbag sensors, the SRS electronic control unit, and side curtain and thorax airbag assemblies. Even when Honda denied

47

warranty coverage for spontaneous deployment incidents, the underlying warranty claims constituted data that Honda was legally obligated to aggregate and analyze for defect patterns. Honda's own warranty claims data thus provided yet another source of information about the scope and frequency of the Spontaneous Airbag Deployment Defect.

209.    The Spontaneous Airbag Deployment Defect is substantially unique to the Class Vehicles. A review of the NHTSA complaints database reveals at least 27 complaints across the 2018–2022 Honda Odyssey model years describing airbag deployment in the absence of a qualifying collision event. The Spontaneous Airbag Deployment Defect is not an inherent limitation of side airbag technology or an unavoidable consequence of road conditions, but rather a defect specific to the design, engineering, or calibration of the SRS system in the Class Vehicles—a system that Honda alone designed, manufactured, and controlled.

**C.    Honda Has Previously Recalled Class Vehicles for Other Safety Defects, Including Airbag-Related Defects**

210.    Honda has issued multiple safety recalls covering the Class Vehicles during the same period it was receiving complaints about the Spontaneous Airbag Deployment Defect. These recalls demonstrate that Honda had the infrastructure, expertise, and regulatory obligation to identify and address safety defects in the Class Vehicles—and for years chose not to do so with respect to the Spontaneous Airbag Deployment Defect.

211.    On or around September 27, 2018—before the first NHTSA complaint of spontaneous airbag deployment in a Class Vehicle—Honda issued NHTSA Recall No. 18V664000, recalling certain 2019 Honda Odyssey vehicles (among other models) because, according to the NHTSA recall summary, "[t]he Supplemental Restraint System (SRS) control unit may have a manufacturing error, possibly resulting in the air bags or seatbelt pretensioners not deploying in the event of a crash." NHTSA stated the consequence was that "[i]n the event of a crash, if the air bags or seatbelt pretensioners do not function as intended, there would be an increased risk of injury." This recall demonstrates that Honda was aware of at least some SRS defects in the Class Vehicles within the first few years of the fifth-generation Odyssey's production.

212. On or around February 6, 2020, Honda issued NHTSA Recall No. 20V066000, recalling certain 2018–2020 Odyssey vehicles because, according to the NHTSA recall summary, "[t]he wire harness for the third row seat accessory power outlet may get pinched between the unibody and rear trim panel, possibly damaging the wires and causing an electrical short." NHTSA stated the consequence was that "[a]n intermittent electrical short could overheat the wire harness, increasing the risk of a fire."

213. These recalls confirm that Honda was actively monitoring the Class Vehicles for safety defects and had the ability to issue recalls.

214. On or around February 1, 2024, Honda issued NHTSA Recall No. 24V064000, recalling certain 2020–2022 Honda Odyssey vehicles (among other models) because, according to the NHTSA recall summary, "[t]he front passenger seat weight sensor may crack and short circuit, failing to suppress the air bag as intended." NHTSA stated the consequence was that "[a]n air bag that deploys unintentionally during a crash can increase the risk of injury." This recall confirms that Honda was actively monitoring and investigating airbag-related defects in the Class Vehicles during the same period it was receiving complaints about the Spontaneous Airbag Deployment Defect—yet Honda took no action to investigate or remedy the Spontaneous Airbag Deployment Defect.

215. Honda also recalled certain Class Vehicles for failures in the broader occupant protection system that surrounds the airbag—confirming that Honda's safety monitoring extended to every component of the restraint system, not just drivetrain or body hardware. Before the first Class Vehicle reached a consumer, Honda issued NHTSA Recall No. 17V397000 (June 23, 2017), recalling 2018 Honda Odyssey vehicles because the third-row center seat belt tongue was incompatible with its latch, preventing the seat belt from latching securely. NHTSA stated the safety risk was that "[i]f in the event of a crash, an unlatched seatbelt may increase the risk of injury to the seat occupant." Honda then issued NHTSA Recall No. 23V158000 (March 9, 2023), recalling 2018–2020 Odyssey vehicles (among other models) because a manufacturing issue with the front seat belts caused "interference between the [seat belt] buckle channel and the release button," which could result in " issues with the seat belt buckle from latching." NHTSA's stated safety risk was that "[i]f the seat belt buckle does not latch, the occupant may not be properly restrained, increasing the risk of injury to the occupant."

216.    Honda was actively monitoring and remediating failures in the occupant protection system at every level of the restraint architecture: from seat belt tongues to airbag sensor circuits. Honda's recall apparatus encompassed the full restraint system. Its decision not to apply that same apparatus to the Spontaneous Airbag Deployment Defect—a failure mode with immediate, acute consequences for occupant safety—was not a gap in capability.

217.    Another recall confirms something more specific: that all Honda Odysseys—across every model year from 2018 through 2023—share a common electronic communication component susceptible to failures that Honda was able to identify and recall. On June 15, 2023, Honda issued NHTSA Recall No. 23V431000, recalling certain 2018–2023 Odyssey vehicles because, according to the NHTSA recall summary, "[d]ue to a faulty Media Oriented Systems Transport (MOST) communication coaxial cable connector, the rearview camera image may not appear on the display." NHTSA noted the consequence was that "[a] rearview camera that does not display an image can reduce the driver's rear view, increasing the risk of a crash or injury."

218.    This recall shows that Honda can identify, at scale, a defect affecting every model year of a vehicle line and can act on it swiftly.

219.    First, Honda had, by June 2023, identified and confirmed a connector-level component failure affecting the electronic systems of Honda Odysseys across all model years from 2018 through 2023—and acted on it with a single, sweeping recall campaign. Second, Honda had the institutional capacity to detect a defect common to multiple model years of a vehicle line and to move decisively. The breadth and speed of the MOST cable recall contrast sharply with Honda's multi-year inaction on the Spontaneous Airbag Deployment Defect, which affected the same vehicles and implicated a far more dangerous failure.

220.    The breadth of Honda's recall activity for the Class Vehicles across the Class Period demonstrates what "active monitoring" actually means in practice. According to the NHTSA recalls database, the 2018 Honda Odyssey alone has been subject to at least thirteen separate NHTSA safety recall campaigns. The 2019 Honda Odyssey has been subject to at least seventeen separate recall campaigns. These campaigns span components ranging from the SRS control unit, to seat belts, to sliding door latches, to brake calipers, to the rearview camera system. Honda's engineers, compliance personnel,

and regulatory team were actively working to identify and remediate safety defects in the Class Vehicles on a rolling basis throughout the Cass Period.

221. A company that issued at least thirteen recalls for a single model year of the Odyssey does not lack the institutional capacity or the monitoring infrastructure to detect a defect generating consumer complaints as early as May 2019.

222. Here, however, Honda's own diagnostic systems recorded unexplained deployment events; its internal case management system logged repeated consumer reports of the same failure mode; its Early Warning Report obligations required it to aggregate and evaluate that data; and its dealers responded to affected consumers with denials attributing deployments to potholes, tire impacts, aftermarket modifications, and other supposed external causes. Honda did not act.

223. Honda had the infrastructure, the complaint data, and the legal obligation—under the TREAD Act and 49 C.F.R. Part 579—to identify and act on the Spontaneous Airbag Deployment Defect. During the same period it was receiving those complaints, Honda identified and recalled the Class Vehicles for airbag sensor failures, seat belt malfunctions, and camera system failures. It did not recall for a defect causing airbags to deploy without warning into passengers in vehicles used by families, including those carrying children.

**D.      Honda Could Have Made Plaintiffs and Members of the Classes Aware of the Defect at the Point of Sale**

224. Plaintiffs and members of the Classes were exposed to Honda's omissions due to Honda's pervasive marketing and advertising campaigns, including marketing material created and distributed by Honda to members of the Classes at Honda-authorized dealerships.

225. Honda could have disclosed the existence of the Spontaneous Airbag Deployment Defect through these avenues. Honda knew or should have known about the Spontaneous Airbag Deployment Defect before the Class Vehicles went to market and Honda had exclusive knowledge of the defect at that time.

226. Honda did not inform consumers (or dealerships) of the defect. Instead, when consumers experienced spontaneous deployments, Honda denied warranty coverage and left them to pay between

51

$3,000 and $11,000 out of pocket to restore their vehicles' airbag systems—shifting those repair costs to consumers despite prior notice of the issue.

## V. HONDA ANNOUNCES A RECALL BASED ON THE SPONTANEOUS AIRBAG DEPLOYMENT DEFECT

227. On April 9, 2026, Honda announced that it would recall 2018-2022 Odyssey vehicles because the "SRS ECU contains incorrect deployment parameters for the side and side curtain air bags, which may cause inadvertent deployment when the vehicle encounters strong road impacts, such as driving over potholes, speed bumps, or road debris." According to the recall notice posted on Honda's website, the "Safety Risk" prompting the recall was that "If the side and side curtain airbags inadvertently deploy, the risk of injury is increased." As a remedy, Honda stated that "Registered owners of all affected vehicles will be contacted by mail and asked to take their vehicle to an authorized Honda dealer. The dealer will reprogram or replace the SRS ECU with improved airbag deployment parameters, as necessary. Owners who have paid to have these repairs completed at their own expense may be eligible for reimbursement, in accord with the recall reimbursement plan on file with NHTSA."

228. According to the Part 573 Safety Recall Report submitted by Honda to the United States Department of Transportation, the cause of the issue was that "[t]he SRS control logic for the second and third rows contain insufficient deployment threshold margin, allowing G-signal inputs to be misinterpreted as side impacts and causing inadvertent of the side and side curtain airbags."

229. In the "Chronology" section of the report, Honda knew of the issue as early as November 15, 2017. The report provides the following chronology regarding Honda's knowledge of the Spontaneous Airbag Deployment Defect:

- "November 15, 2017**:** Honda received notification of an incident and began to investigate and analyze the issue."

- "February 21, 2017: Honda continued to investigate and analyze the issue."

- "July 2021: Honda's investigation of incident-related vehicles and returned parts determined that, under certain conditions such as poor road surfaces, driving over debris or undercarriage impacts, the second and third-row airbag deployment thresholds could be reached, resulting in deployment of the side and side curtain airbags."

52

- "October 27, 2021: Honda analyzed and evaluated the issue and determined there were no safety concerns."

- "October 28, 2025: Honda received a Preliminary Evaluation request from NHTSA (PE25-018)."

- "January 7, 2026: Honda continued to study inadvertent airbag deployment situations and analyze the potential for material injury."

- "January 22, 2026: Honda responded to the Preliminary Evaluation request from NHTSA (PE25-018)."

- "March 2026: Honda conducted additional market data analysis related to the issue."

- "April 2, 2026: Honda determined that a defect related to motor vehicle safety existed and decided to conduct a safety recall."

- "As of April 2, 2026, Honda has had 130 warranty claims, 25 reports of an injury, and no reports of death related to this issue from January 24, 2017 – April 2, 2026."

230.    Honda has, in the past, issued recalls that did not fully fix a subject defect or problem, and in 2015 paid a $70 million civil penalty for failing to comply with its early warning reporting obligations. With respect to the Defect here, Honda waited several years, with voluminous knowledge of the Defect, before agreeing to any recall at all.

231.    There is no indication as of the filing of this complaint that Honda's recall is fully effective, and indeed its technical description appears to envision something less than a full replacement and repair of the defective airbag system in the Class Vehicles.

232.    More, the publicly acknowledged defectiveness of the Class Vehicles with respect to a key safety system has diminished, and will continue to diminish, the value of those Class Vehicles, including with respect to trade-in and resale, irrespective of the effectiveness of Honda's recall.

## VI.    THE HARM TO PLAINTIFFS AND THE CLASSES

233.    Plaintiffs and members of the Classes have suffered concrete economic harm as a result of Honda's concealment of the Spontaneous Airbag Deployment Defect.

234. Each Plaintiff purchased or leased a Class Vehicle at a price that reflected Honda's representations that the vehicle was safe, reliable, and equipped with a properly functioning airbag system.

235. Those representations were false. The Class Vehicles are worth substantially less than what Plaintiffs and Class members paid for them because they contain a latent safety defect that Honda concealed.

236. The diminution in value of the Class Vehicles stems from the nature and severity of the defect itself. The Spontaneous Airbag Deployment Defect means that every Class Vehicle carries a risk that its airbags will deploy without warning, without a collision, and without any way for the owner to predict or prevent it. When such a deployment occurs, occupants face the risk of burns, hearing damage, exposure to chemical fumes, and loss of vehicle control. The vehicle's entire SRS system is rendered inoperable until replaced—at a cost of $3,000 to $11,000 that Honda has routinely refused to cover under warranty. A reasonable consumer aware of these facts would not pay the same price for a Class Vehicle as one without the defect, or would not purchase the vehicle at all.

237. No reasonable consumer would pay full price for a minivan marketed as a safe family vehicle if the consumer knew that the airbags could deploy spontaneously while driving over a pothole, hitting a speed bump, or even while refueling—and that Honda would deny warranty coverage when it happened. The difference between the price Plaintiffs paid for their Class Vehicles and the true market value of those vehicles, had the defect been disclosed, constitutes Plaintiffs' economic damages.

238. In addition to the overpayment, members of the Classes who have experienced the Spontaneous Airbag Deployment Defect have incurred out-of-pocket repair costs that Honda has refused to cover. Consumers report that Honda routinely denies warranty coverage for spontaneous deployments, attributing them to external causes such as potholes or tire impacts rather than acknowledging the defect. As a result, Class members have been forced to pay between $3,000 and $11,000 to restore their vehicles' SRS systems to working condition—a cost that should have been borne by Honda.

239. Honda's recently announced recall, which among other things publicly acknowledges that Class Vehicles have a defect in a critical safety system, does not cure Class Members' economic harm. To the contrary, Honda has a history of incomplete or imperfect recalls and its public acknowledgement

54

that the Class Vehicles are defective with respect to the subject airbag systems, combined with an uncertain recall, impairs the value of Class Vehicles, both through resale value and through impaired present use.

240.   Members of the Classes whose vehicles have not yet experienced a spontaneous deployment have suffered economic harm. Their vehicles are worth less today than they would be absent the defect, including because the defect creates an ongoing risk of spontaneous deployment that diminishes the vehicles' market value and because Honda's public acknowledgement of the defect taints the Class Vehicles with a serious defect as to an important safety system directed at families. This diminution in value exists regardless of whether any particular vehicle has experienced the defect, because every Class Vehicle is subject to the same risk and diminution of resale value.

## TOLLING OF THE STATUTES OF LIMITATIONS

62.   Plaintiffs and the members of the Classes are entitled to tolling of the statutes of limitations applicable to the claims asserted below, as Plaintiffs and the members of the Classes did not discover—and could not have reasonably discovered—that the Class Vehicles they purchased and/or leased were defective, until very recently.

63.   Until April 2026, Honda had not publicly disclosed the existence of the Spontaneous Airbag Deployment Defect in the Class Vehicles.

64.    On October 28, 2025, NHTSA opened a preliminary evaluation to determine "the scope and severity of the potential problem [inadvertent air bag deployment] and to fully assess the potential safety-related issues."

65.   Plaintiffs and the members of the Classes could not reasonably have known about the Spontaneous Airbag Deployment Defect in the Class Vehicles until Honda's recall announcement, and at earliest until NHTSA opened a preliminary evaluation in October 2025. And in fact, Plaintiffs and the members of the Classes did not know about the Spontaneous Airbag Deployment Defect in the Class Vehicles before NHTSA's evaluation and Honda's recall.

66.   No reasonable amount of diligence could have uncovered Honda's defectively designed airbag deployment system in the Class Vehicles until Honda's April 2026 recall, or at earliest when NHTSA opened its preliminary evaluation on October 28, 2025.

55

67. Because Plaintiffs and the members of the Classes could not have known—and did not actually know—about the defect Honda failed to disclose, the statutes of limitations applicable to the claims they assert here are tolled until the April 9, 2026 recall announcement, or at earliest October 28, 2025, the date of the NHTSA preliminary investigation.

68. *Estoppel.* Honda was under a continuous duty to disclose to Plaintiffs and the other members of the Classes the true character, quality, and nature of the Class Vehicles, including the existence of the Spontaneous Airbag Deployment Defect.

69. Honda knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Spontaneous Airbag Deployment Defect in the Class Vehicles.

70. Honda had knowledge of the Defect based on, among other things, consumer complaints submitted to NHTSA, its own Early Warning Reporting obligations under the TREAD Act, complaints made directly to Honda and its dealers, and information available from online forums and other public sources.

71. Based on the foregoing, Honda is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

72. Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of the proposed classes of persons (collectively, the "Classes") defined below.

73. Each class's claims derive directly from a course of conduct by Honda.

74. Honda has engaged in uniform and standardized conduct toward each class. Honda did not materially differentiate in its actions or inactions toward members of the respective Classes. For each class, the objective facts on these subjects are the same for all class members.

75. Within each Claim for Relief asserted by each class, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Fed. R. Civ. P. 23.

76. This action may be brought and properly maintained as a class action because the questions it presents are of a common or general interest, and of many persons, and also because the

56

parties are numerous, and it is impracticable to bring them all before the court. Plaintiffs may sue for the benefit of all as representative parties pursuant to Federal Rule of Civil Procedure 23.

77.     Plaintiffs reserve the right to revise the class definitions based upon information learned through discovery.

### The California Class

78.     Plaintiffs Hojati, Uribe, Paz, and Parmelee bring this action and seek to certify and maintain it as a class action on behalf of themselves and a California Class. The California Class comprises:

> All persons or entities who purchased or leased one or more model year 2018, 2019, 2020, 2021, and/or 2022 Honda Odyssey vehicles (the "Class Vehicles") in the State of California from May 25, 2017 to the present (the "Class Period").

79.     Excluded from the California Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the California Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Florida Class

80.     Plaintiff Szylkowski brings this action and seeks to certify and maintain it as a class action on behalf of himself and a Florida Class. The Florida Class comprises:

> All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Florida during the Class Period.

81.     Excluded from the Florida Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Florida Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers;

governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Georgia Class

82.    Plaintiff CK Patel brings this action and seeks to certify and maintain it as a class action on behalf of himself and a Georgia Class. The Georgia Class comprises:

> All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Georgia during the Class Period.

83.    Excluded from the Georgia Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Georgia Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Illinois Class

84.    Plaintiffs Ryan, Miller, and McLaughlin bring this action and seek to certify and maintain it as a class action on behalf of themselves and an Illinois Class. The Illinois Class comprises:

> All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Illinois during the Class Period.

85.    Excluded from the Illinois Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Illinois Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**The Indiana Class**

86.    Plaintiff Weaver brings this action and seeks to certify and maintain it as a class action on behalf of herself and an Indiana Class. The Indiana Class comprises:

> All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Indiana during the Class Period.

87.    Excluded from the Indiana Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Indiana Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**The Kentucky Class**

88.    Plaintiff Trinh brings this action and seeks to certify and maintain it as a class action on behalf of himself and a Kentucky Class. The Kentucky Class comprises:

> All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Kentucky during the Class Period.

89.    Excluded from the Kentucky Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Kentucky Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**The Michigan Class**

90.    Plaintiff Paurang Patel brings this action and seeks to certify and maintain it as a class action on behalf of himself and a Michigan Class. The Michigan Class comprises:

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Michigan during the Class Period.

91.    Excluded from the Michigan Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Michigan Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Nebraska Class

92.    Plaintiff Griffin brings this action and seeks to certify and maintain it as a class action on behalf of himself and a Nebraska Class. The Nebraska Class comprises:

All persons or entities in the State of Nebraska who purchased or leased one or more of the Class Vehicles during the Class Period.

93.    Excluded from the Nebraska Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Nebraska Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The North Carolina Class

94.    Plaintiffs Moore and Carr bring this action and seek to certify and maintain it as a class action on behalf of themselves and a North Carolina Class. The North Carolina Class comprises:

All persons or entities in North Carolina who purchased or leased one or more of the Class Vehicles during the Class Period.

95.    Excluded from the North Carolina Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class

Vehicles. Also excluded from the North Carolina Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

## The Ohio Class

96.     Plaintiff Veerabrahma brings this action and seeks to certify and maintain it as a class action on behalf of himself and an Ohio Class. The Ohio Class comprises:

> All persons or entities in Ohio who purchased or leased one or more of the Class Vehicles during the Class Period.

97.     Excluded from the Ohio Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Ohio Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

## The Pennsylvania Class

98.     Plaintiff Kupec brings this action and seeks to certify and maintain it as a class action on behalf of himself and a Pennsylvania Class. The Pennsylvania Class comprises:

> All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Pennsylvania during the Class Period.

99.     Excluded from the Pennsylvania Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Pennsylvania Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this

action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Texas Class

100. Plaintiffs Amlani, Lee, Maynard, and Mohammed bring this action and seek to certify and maintain it as a class action on behalf of themselves and a Texas Class. The Texas Class comprises:

> All persons or entities in Texas who purchased or leased one or more of the Class Vehicles during the Class Period.

101. Excluded from the Texas Class are individuals who have personal injury or property damages claims resulting from the Spontaneous Airbag Deployment Defect in their Class Vehicles. Also excluded from the Texas Class are Honda, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly or partly owned subsidiaries or affiliates, and Honda dealers; governmental entities; all persons who make a timely election to be excluded from this action; Plaintiffs' counsel; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### Numerosity

102. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).

103. The members of the Classes are so numerous and geographically dispersed that individual joinder of all members would be impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be over 400,000 Class Vehicles in the United States.

104. The precise number of members of the Classes is unknown to Plaintiffs but may be ascertained from Honda and third parties' records.

### Commonality and Predominance

105. This action and the claims asserted by the classes satisfy the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because there are many questions of law and fact that are common as to all of the members of the Classes.

106. These questions of fact and law concern Honda's conduct, which is common as to the members of the Classes, and answers to those questions would provide answers to issues posed by claims asserted by all members of the Classes.

107. These common issues will predominate at trial, and any individual issues that may arise would not outweigh the predominance of common issues.

108. Common issues that will predominate at trial include, without limitation, the following:

a. Whether Honda engaged in the conduct alleged herein;

b. Whether Honda designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c. Whether the Class Vehicles contain a defect;

d. Whether the Class Vehicles contain a safety defect;

e. Whether Honda knew about the Spontaneous Airbag Deployment Defect and, if so, how long Honda has known of it;

f. Whether Honda designed, manufactured, marketed, and distributed the Class Vehicles with the Spontaneous Airbag Deployment Defect;

g. Whether Honda's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

h. Whether Plaintiffs and the other members of the Classes overpaid for their Class Vehicles;

i. Whether Plaintiffs and the other members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

j. Whether Plaintiffs and the other members of the Classes are entitled to damages and other monetary relief and, if so, in what amount.

**Typicality**

109. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the members of the Classes.

110. Plaintiffs' claims are the same as those asserted by members of the Classes. Plaintiffs, like the members of the Classes, have purchased or leased a Class Vehicle.

111.    Plaintiffs allege injury that is not unique to them, but is typical of members of each of the Classes. Plaintiffs allege that their injury flows from the common course of conduct alleged as to Honda.

112.    Plaintiffs and all Class Members have suffered damages as a result of Honda's wrongful conduct as described above.

113.    Plaintiffs are similarly positioned as to each member of the Classes. As such, Plaintiffs' injury can be redressed in the same manner as any redress provided to the members of the Classes (and *vice versa*).

**Adequate Representation**

114.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs and their counsel will fairly and adequately protect the interests of the class members.

115.    Plaintiffs are committed to putting the interest of the Classes ahead of their own and to act in the best interest of members of the Classes.

116.    Plaintiffs understand their obligations to the Classes and are committed to monitoring/supervising developments in the case and class counsel.

117.    Plaintiffs have retained competent counsel experienced in complex litigation and consumer class actions.

118.    Plaintiffs have retained counsel with the resources and capital to litigate the case on behalf of the Classes.

119.    Plaintiffs and their counsel intend to prosecute this action vigorously and to obtain relief, including both injunctive and monetary relief.

**Ascertainability**

120.    The Classes are ascertainable.

121.    The defined Classes consist of persons and entities that purchased or leased Class Vehicles. The identity of these purchasers or lessees can be determined through records maintained by Honda.

122.    This information can be used to provide members of each class with direct notice pursuant to the requirements of Rule 23 and the Due Process Clause of the United States Constitution. Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice

dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

## Grounds Generally Applicable to the Class

123. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Honda has acted and/or refused to act on grounds generally applicable to the Classes, thereby making final injunctive and/or corresponding declaratory relief appropriate with respect to each class as a whole.

## Superiority

124. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3).

125. The class device is superior to all other available methods of adjudication, as it would make little sense for each of the hundreds of thousands of class members to separately prove the common conduct in which Honda has engaged.

126. Moreover, the damages or other financial detriment suffered by Plaintiffs and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Honda, so it would be impracticable for the members of the Classes to individually seek redress for Honda's conduct.

127. Even if the members of the Classes could afford individual litigation, the court system could not.

128. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

129. Class litigation is thus superior to individual litigation and is the best procedural device to vindicate the rights of the members of the Classes.

130. In addition, class litigation will streamline the management of the litigation, such that the expense, burdens, inconsistencies, economic infeasibility, and other negative effects of individual mitigation will be lessened if not eliminated.

131. In sum, class litigation is superior because it mitigates significant inefficiencies and barriers that would result from individual litigation. In fact, absent invocation of the class device, the

65

Classes' claims would likely not be vindicated individually, and the injury to the hundreds of thousands of purchasers and lessees of the Class Vehicles would go unaddressed.

**CLAIMS FOR RELIEF**

**REALLEGATION AND INCORPORATION BY REFERENCE**

132. Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the classes.

**A.      Claims Brought on Behalf of the California Class**

**COUNT ONE**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***

133. Plaintiffs Hojati, Uribe, Paz, and Parmelee bring this Count on behalf of the California Class.

134. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), proscribes acts of unfair competition, including "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

135. Honda's conduct, as described herein, was and is in violation of the UCL. Honda's conduct violates the UCL in at least the following ways:

   a. By knowingly and intentionally concealing from Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class;

   b. By marketing the Class Vehicles as possessing functional and defect-free airbag systems;

   c. By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect; and

   d. By violating other California laws, including California laws governing false advertising and consumer protection.

66

136. Honda's misrepresentations and omissions alleged herein caused Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Spontaneous Airbag Deployment Defect.

137. Accordingly, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

138. The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

139. Plaintiffs Hojati, Uribe, Paz, and Parmelee seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Honda under Cal. Bus. & Prof. Code § 17200.

140. Plaintiffs Hojati, Uribe, Paz, and Parmelee request that this Court enter such orders or judgments as may be necessary to enjoin Honda from continuing its unfair, unlawful, and/or deceptive practices; to restore to Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §§ 17203 & 3345; and for such other relief set forth below.

**COUNT TWO**
**Violation of California's Consumer Legal Remedies Act**
**Cal. Civ. Code § 1750 *et seq.***

141. Plaintiffs Hojati, Uribe, Paz, and Parmelee bring this Count on behalf of the California Class.

142. California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any

67

person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

143. The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

144. Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs Hojati, Uribe, Paz, and Parmelee, the members of the California Class, and Honda are "persons" as defined in Cal. Civ. Code § 1761(c).

145. As alleged above, Honda made numerous representations concerning the benefits, efficiency, performance, and safety features of the Class Vehicles that were misleading immediately preceding and during the Class Period.

146. In purchasing or leasing the Class Vehicles, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class were deceived by Honda's failure to disclose that the Class Vehicles were equipped with the Spontaneous Airbag Deployment Defect.

147. Honda's conduct, as described herein, was and is in violation of the CLRA. Honda's conduct violates at least the following enumerated CLRA provisions:

    a. Cal. Civ. Code § 1770(a)(2): Misrepresenting the approval or certification of goods;

    b. Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

    c. Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

    d. Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

    e. Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

148. Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class have suffered injury in fact and actual damages resulting from Honda's material omissions and misrepresentations because they paid an inflated purchase or lease price for the Class Vehicles.

149.    The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

150.    Honda knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Spontaneous Airbag Deployment Defect, and that the Class Vehicles were not suitable for their intended use.

151.    The facts concealed and omitted by Honda to Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would not have paid the prices they paid in fact.

152.    In accordance with Civil Code § 1780(a), Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class seek damages and injunctive and equitable relief for Honda's violations of the CLRA, including an injunction to enjoin Honda from continuing its deceptive advertising and sales practices.

153.    Plaintiffs Hojati, Uribe, Paz, and Parmelee's and the California Class members' injuries were proximately caused by Honda's fraudulent and deceptive business practices.

154.    Therefore, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class are entitled to equitable and monetary relief under the CLRA.

**COUNT THREE**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, *et seq.***

155.    Plaintiffs Hojati, Uribe, Paz, and Parmelee bring this Count on behalf of the California Class.

156.    Cal. Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this

state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

157.    Honda caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Honda, to be untrue and misleading to consumers, including Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class during the Class Period.

158.    Honda has violated Cal. Bus. & Prof. Code § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Class Vehicles, as set forth in this Complaint, were material and likely to deceive a reasonable consumer.

159.    Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class have suffered an injury in fact, including the loss of money or property, as a result of Honda's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class relied on the misrepresentations and/or omissions of Honda with respect to the safety, performance, and reliability of the Class Vehicles. Honda's representations were false because the Class Vehicles are distributed with defectively designed airbags that may spontaneously deploy; such that the Spontaneous Airbag Deployment Defect poses safety risks and threatens serious injury to passengers in the Class Vehicles and hinders operability of the Class Vehicles. Had Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

160.    Accordingly, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class overpaid for their Class Vehicles and did not receive the benefit of their bargain.

161.    The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

162.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Honda's business. Honda's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

163.    Plaintiffs Hojati, Uribe, Paz, and Parmelee, individually and on behalf of the members of the California Class, request that this Court enter such orders or judgments as may be necessary to enjoin Honda from continuing their unfair, unlawful, and/or deceptive practices, to restore to Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class any money Honda acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT FOUR**
**Fraudulent Concealment**
**Based on California Law**

164.    Plaintiffs Hojati, Uribe, Paz, and Parmelee bring this Count on behalf of the California Class.

165.    As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

166.    Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

167.    In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda, which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

71

168. Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

169. Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

170. Honda still has not made full and adequate disclosure and continues to defraud Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class.

171. Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs Hojati, Uribe, Paz, and Parmelee's and the California Class members' actions were justified. Honda was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs Hojati, Uribe, Paz, and Parmelee, or the California Class.

172. As a result of the concealment and/or suppression of the facts, members of the California Class sustained damage.

173. Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs Hojati, Uribe, Paz, and Parmelee's and the California Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIVE
### Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability
### Cal. Civ. Code §§ 1791.1 & 1792

174. Plaintiffs Hojati, Uribe, Paz, and Parmelee bring this Count on behalf of the California Class.

175. Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class who purchased or leased the Class Vehicles in California are "buyers" and/or "lessees" within the meaning of Cal. Civ. Code § 1791(b) & (h).

176. The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

177. Honda is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

178. Honda impliedly warranted to Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

179. Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(a) Pass without objection in the trade under the contract description.

(b) Are fit for the ordinary purposes for which such goods are used.

(c) Are adequately contained, packaged, and labeled.

(d) Conform to the promises or affirmations of fact made on the container or label.

180. The Class Vehicles would not pass without objection in the automotive trade because of the Spontaneous Airbag Deployment Defect in the Class Vehicles. Specifically, the Spontaneous Airbag Deployment Defect may cause the airbags to suddenly deploy with little to no cause, posing safety risks and threatening serious injury to passengers in the Class Vehicles and hindering operability of the Class Vehicles. In addition, the defective airbags were not adequately designed, manufactured, and tested.

181. Because of the Spontaneous Airbag Deployment Defect in the Class Vehicles, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

182. The Class Vehicles are not adequately labeled because the labeling fails to disclose the Spontaneous Airbag Deployment Defect in the Class Vehicles.

73

183.    Honda breached the implied warranty of merchantability by manufacturing and selling and leasing the Class Vehicles containing the Spontaneous Airbag Deployment Defect. Furthermore, these defects have caused Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

184.    As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class received goods whose defective condition substantially impairs their value to Plaintiffs Hojati, Uribe, and Paz and the members of the California Class. Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class have been damaged as a result of the diminished value of Honda's products, the products' malfunctioning, and the non-use of their Class Vehicles.

185.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class are entitled to damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles.

186.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs Hojati, Uribe, Paz, and Parmelee and the members of the California Class are entitled to costs and attorneys' fees.

**B.    Claims Brought on Behalf of the Florida Class**

### COUNT SIX
### Violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)
### Fla. Stat. §§ 501.201 *et seq.*

187.    Plaintiff Szylkowski brings this Count on behalf of the Florida Class.

188.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

189.    Under Fla. Stat. §§ 501.201 *et seq.*, deceptive acts or practices include representing that goods have sponsorship, approval, characteristics, uses, or benefits that they do not have. Fla. Stat. § 501.203.

190.    Plaintiff Szylkowski and the members of the Florida Class are "consumers" within the meaning of Fla. Stat. § 501.203(7). The Class Vehicles are "goods" within the meaning of Fla. Stat. § 501.203(8).

191.    Honda's conduct, as described herein, was and is in violation of Fla. Stat. §§ 501.201 *et seq.* Honda's conduct violates Fla. Stat. §§ 501.201 *et seq.* in at least the following ways:

192.    By knowingly and intentionally concealing from Plaintiff Szylkowski and the members of the Florida Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiff Szylkowski and the members of the Florida Class;

193.    By marketing the Class Vehicles as possessing functional and defect-free airbag systems;

194.    By failing to repair and/or replace the Spontaneous Airbag Deployment Defect in Class Vehicles; and

195.    By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect.

196.    Honda's misrepresentations and omissions alleged herein caused Plaintiff Szylkowski and the members of the Florida Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff Szylkowski and the members of the Florida Class would not have purchased or leased their Class Vehicles or would have paid significantly less for them.

197.    Accordingly, Plaintiff Szylkowski and the members of the Florida Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

198.    The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

199.    Pursuant to Fla. Stat. § 501.211, Plaintiff Szylkowski and the members of the Florida Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, together with interest, attorneys' fees, and all other available relief.

**COUNT SEVEN**
**Fraudulent Concealment**
**Based on Florida Law**

200.    Plaintiff Szylkowski brings this Count on behalf of the Florida Class.

201.    As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

202.    Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those already stated.

203.    In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiff Szylkowski and the members of the Florida Class.

204.    Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

205.    Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Szylkowski and the members of the Florida Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

206.    Honda still has not made full and adequate disclosure and continues to defraud Plaintiff Szylkowski and the members of the Florida Class.

207.    Plaintiff Szylkowski and the members of the Florida Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff Szylkowski's and the Florida Class members' actions were justified. Honda was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff Szylkowski, or the Class.

Class Action Complaint – Case No. 26-cv-04431

208. As a result of the concealment and/or suppression of the facts, members of the Florida Class sustained damage.

209. Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Szylkowski and the Florida Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**C.    Claims Brought on Behalf of the Georgia Class**

**COUNT EIGHT**
**Violation of Georgia's Fair Business Practices Act (FBPA)**
**O.C.G.A. §§ 10-1-390, *et seq.***

210. Plaintiff CK Patel brings this Count on behalf of the Georgia Class.

211. Georgia's Fair Business Practices Act ("FBPA") prohibits "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." O.C.G.A. § 10-1-393(a).

212. Under O.C.G.A. §§ 10-1-390 *et seq.*, deceptive acts include representing that goods have sponsorship, approval, characteristics, uses, or benefits that they do not have. O.C.G.A. § 10-1-393(b).

213. The purchases and/or leases of the Class Vehicles by Plaintiff CK Patel and the members of the Georgia Class are "consumer transactions" within the meaning of O.C.G.A. § 10-1-392(a)(7).

214. Honda's conduct, as described herein, was and is in violation of O.C.G.A. §§ 10-1-390 *et seq.* Honda's conduct violates O.C.G.A. §§ 10-1-390 *et seq.* in at least the following ways:

215. By knowingly and intentionally concealing from Plaintiff CK Patel and the members of the Georgia Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiff CK Patel and the members of the Georgia Class;

216. By marketing the Class Vehicles as possessing functional and defect-free airbag systems;

217. By failing to repair and/or replace the Spontaneous Airbag Deployment Defect in Class Vehicles; and

218. By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect.

77

219. Honda's misrepresentations and omissions alleged herein caused Plaintiff CK Patel and the members of the Georgia Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff CK Patel and the members of the Georgia Class would not have purchased or leased their Class Vehicles or would have paid significantly less for them.

220. Accordingly, Plaintiff CK Patel and the members of the Georgia Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

221. The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

222. Pursuant to O.C.G.A. § 10-1-399, Plaintiff CK Patel and the members of the Georgia Class seek actual damages, together with interest, attorneys' fees, and all other relief available under the FBPA.

**COUNT NINE**
**Fraudulent Concealment**
**Based on Georgia Law**

223. Plaintiff CK Patel brings this Count on behalf of the Georgia Class.

224. As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

225. Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those already stated.

226. In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiff CK Patel and the members of the Georgia Class.

227. Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

228. Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff CK Patel and the members of the Georgia Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

229. Honda still has not made full and adequate disclosure and continues to defraud Plaintiff CK Patel and the members of the Georgia Class.

230. Plaintiff CK Patel and the members of the Georgia Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff CK Patel's and the Georgia Class members' actions were justified. Honda was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff CK Patel, or the Class.

231. As a result of the concealment and/or suppression of the facts, members of the Georgia Class sustained damage.

232. Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff CK Patel's and the Georgia Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT TEN**
**Breach of Implied Warranty of Merchantability**
**O.C.G.A. § 11-2-314 & O.C.G.A. § 11-2A-212**

233. Plaintiff CK Patel brings this Count on behalf of members of the Georgia Class.

234. Plaintiff CK Patel and the members of the Georgia Class are "buyers" and/or "lessees" within the meaning of O.C.G.A. §§ 11-2-103(1)(a) & 11-2A-103(1)(n).

235. Honda is a "merchant" of the Class Vehicles within the meaning of O.C.G.A. § 11-2-104(1).

236. Honda impliedly warranted to Plaintiff CK Patel and the members of the Georgia Class that its Class Vehicles were "merchantable" within the meaning of O.C.G.A. §§ 11-2-314 & 11-2A-212; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

237. O.C.G.A. §§ 11-2-314 & 11-2A-212 states that goods must "pass without objection in the trade" under "the contract description" or "the description in the lease agreement" to be merchantable.

238. The Class Vehicles would not pass without objection in the automotive trade because of the Spontaneous Airbag Deployment Defect in the Class Vehicles. Specifically, the Spontaneous Airbag Deployment Defect may cause the airbags to suddenly deploy with little to no cause, posing safety risks and threatening to cause injury to Class Vehicle occupants.

239. Because of the Spontaneous Airbag Deployment Defect in the Class Vehicles, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

240. The Class Vehicles are not adequately labeled because the labeling fails to disclose the Spontaneous Airbag Deployment Defect in the Class Vehicles.

241. Honda breached the implied warranty of merchantability by manufacturing and selling and leasing the Class Vehicles containing the Spontaneous Airbag Deployment Defect. Furthermore, these defects have caused Plaintiff CK Patel and the members of the Georgia Class to not receive the benefit of their bargain.

242. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff CK Patel and the members of the Georgia Class received goods whose defective condition substantially impairs their value to Plaintiff CK Patel and the members of the Georgia Class. Plaintiff CK Patel and the members of the Georgia Class have been damaged as a result of the diminished value of their Class Vehicles.

243. Honda was provided notice of the Spontaneous Airbag Deployment Defect in Class Vehicles via consumer complaints to NHTSA regarding the Spontaneous Airbag Deployment Defect in Class Vehicles, NHTSA commencing a preliminary evaluation related to the Spontaneous Airbag Deployment Defect in Class Vehicles, and this lawsuit.

244. Pursuant to O.C.G.A. §§ 11-2-714 & 11-2A-519, Plaintiff CK Patel and the members of the Georgia Class are entitled to damages and other legal and equitable relief, including, at their election,

80

the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, together with interest, attorneys' fees, and all other available relief.

**D.    Claims Brought on Behalf of the Illinois Class**

**COUNT ELEVEN**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1 *et seq.***

245.    Plaintiffs Ryan, Miller, and McLaughlin bring this Count on behalf of the Illinois Class.

246.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA"), prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

247.    Honda, Plaintiffs Ryan, Miller, and McLaughlin, and the members of the Illinois Class are each "persons" as defined by 815 ILCS 505/1(c).

248.    The Class Vehicles are "merchandise" under 815 ILCS 505/1(b).

249.    Honda has at all relevant times engaged in "trade" and "commerce" as defined in 815 ILCS 505/1(f), by advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in Illinois, directly or indirectly affecting Illinois citizens through that trade and commerce.

250.    Honda's conduct, as described herein, was and is in violation of the ICFA. Honda's conduct violates the ICFA in at least the following ways:

    a.    By knowingly and intentionally concealing from Plaintiffs Ryan, Miller, and McLaughlin and the members of the Illinois Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs Ryan, Miller, and McLaughlin and the members of the Illinois Class;

    b.    By marketing the Class Vehicles as possessing functional and defect-free airbag systems; and

c.   By violating federal laws, including the Motor Vehicle Safety Act, TREAD Act, and NHTSA regulations.

251.   Honda's misrepresentations and omissions alleged herein were intended to induce Plaintiffs Ryan, Miller, and McLaughlin and the members of the Illinois Class to make their purchases or leases of their Class Vehicles.

252.   Honda's misrepresentations and omissions alleged herein caused Plaintiffs Ryan, Miller, and McLaughlin and the members of the Illinois Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs Ryan, Miller, and McLaughlin and the members of the Illinois Class would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Spontaneous Airbag Deployment Defect.

253.   Accordingly, Plaintiffs Ryan, Miller, and McLaughlin and the members of the Illinois Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

254.   The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

255.   Pursuant to 815 ILCS 505/10a, Plaintiffs Ryan, Miller, and McLaughlin and the members of the Illinois Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, attorneys' fees and costs, an order enjoining Honda's unfair and deceptive acts or practices, and any other just and proper relief available under 815 ILCS 505/1 *et seq.*

E.   **Claims Brought on Behalf of the Indiana Class**

**COUNT TWELVE**
**Violation of Indiana's Deceptive Consumer Sales Act**
**Ind. Code § 24-5-0.5-1 *et seq.***

256.   Plaintiff Weaver brings this Count on behalf of the Indiana Class.

82

257.    Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.* ("DCSA"), prohibits a supplier from engaging in "unfair, abusive, or deceptive act[s], omission[s], or practice[s] in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a)

258.    Under the DCSA, deceptive acts include, but are not limited to, representing "[t]hat such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have" and "[t]hat such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not." Ind. Code § 24-5-0.5-3(b)(1)-(2).

259.    The purchases and/or leases of the Class Vehicles by Plaintiff Weaver and the members of the Indiana Class are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(1).

260.    Honda is a "supplier" of the Class Vehicles within the meaning of Ind. Code § 24-5-0.5-2(3).

261.    Honda's conduct, as described herein, was and is in violation of the DCSA. Honda's conduct violates the DCSA in at least the following ways:

    a.    By knowingly and intentionally concealing from Plaintiff Weaver and the members of the Indiana Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiff Weaver and the members of the Indiana Class;

    b.    By marketing the Class Vehicles as possessing functional and defect-free airbag systems; and

    c.    By violating federal laws, including the Motor Vehicle Safety Act, TREAD Act, and NHTSA regulations.

262.    Honda's misrepresentations and omissions alleged herein caused Plaintiff Weaver and the members of the Indiana Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff Weaver and the members of the Indiana Class would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Spontaneous Airbag Deployment Defect.

263.    Accordingly, Plaintiff Weaver and the members of the Indiana Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

264.    The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

265.    Pursuant to Ind. Code § 24-5-0.5-4(a), Plaintiff Weaver and the members of the Indiana Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, treble damages, and attorneys' fees.

## COUNT THIRTEEN
### Fraudulent Concealment
### Based on Indiana Law

266.    Plaintiff Weaver brings this Count on behalf of the Indiana Class.

267.    As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

268.    Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

269.    In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiff Weaver and the members of the Indiana Class. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

84

270. Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

271. Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Weaver and the members of the Indiana Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

272. Honda still has not made full and adequate disclosure and continues to defraud Plaintiff Weaver and the members of the Indiana Class.

273. Plaintiff Weaver and the members of the Indiana Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff Weaver's and the Indiana Class members' actions were justified. Honda was in exclusive control of the material facts and such facts were not known to the public, Plaintiff Weaver, or the Indiana Class.

274. As a result of the concealment and/or suppression of the facts, members of the Indiana Class sustained damage.

275. Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Weaver's and the Indiana Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT FOURTEEN
**Breach of Implied Warranty of Merchantability**
**Ind. Code § 26-1-2-314 & Ind. Code § 26-1-2.1-212**

276. Plaintiff Weaver brings this Count on behalf of members of the Indiana Class.

277. Plaintiff Weaver and the members of the Indiana Class are "buyers" and/or "lessees" within the meaning of Ind. Code §§ 26-1-2-103(1)(a) & 26-1-2.1-103(1)(n).

278. Honda is a "merchant" of the Class Vehicles within the meaning of Ind. Code § 26-1-2-104(1).

279. Honda impliedly warranted to Plaintiff Weaver and the members of the Indiana Class that its Class Vehicles were "merchantable" within the meaning of Ind. Code §§ 26-1-2-314 & 26-1-2.1-212; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

280. Ind. Code § 26-1-2-314 and Ind. Code § 26-1-2.1-212 state that goods must "pass without objection in the trade" under "the contract description" or "the description in the lease agreement" to be merchantable.

281. The Class Vehicles would not pass without objection in the automotive trade because of the Spontaneous Airbag Deployment Defect in the Class Vehicles. Specifically, the Spontaneous Airbag Deployment Defect may cause the airbags to suddenly deploy with little to no cause, posing safety risks and threatening serious injury to passengers in the Class Vehicles and hindering operability of the Class Vehicles. In addition, the defective airbags were not adequately designed, manufactured, and tested.

282. Because of the Spontaneous Airbag Deployment Defect in the Class Vehicles, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

283. The Class Vehicles are not adequately labeled because the labeling fails to disclose the Spontaneous Airbag Deployment Defect in the Class Vehicles.

284. Honda breached the implied warranty of merchantability by manufacturing and selling and leasing the Class Vehicles containing the Spontaneous Airbag Deployment Defect. Furthermore, these defects have caused Plaintiff Weaver and the members of the Indiana Class to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

285. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff Weaver and the members of the Indiana Class received goods whose defective condition substantially impairs their value to Plaintiff Weaver and the members of the Indiana Class. Plaintiff Weaver and the members of the Indiana Class have been damaged as a result of the diminished value of Honda's products, the products' malfunctioning, and the non-use of their Class Vehicles.

286. Pursuant to Ind. Code §§ 26-1-2-714 & 26-1-2.1-519, Plaintiff Weaver and the members of the Indiana Class are entitled to damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles.

**F.      Claims Brought on Behalf of the Kentucky Class**

**COUNT FIFTEEN**
**Fraudulent Concealment**
**Based on Kentucky Law**

287.     Plaintiff Trinh brings this Count on behalf of the Kentucky Class.

288.     As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

289.     Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Honda created an impression of full disclosure by representing that the Class Vehicles were free from significant defects. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

290.     In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiff Trinh and the members of the Kentucky Class. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

291.     Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

292.     Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Trinh and the members of the Kentucky Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

293.     Honda still has not made full and adequate disclosure and continues to defraud Plaintiff Trinh and the members of the Kentucky Class.

294.    Plaintiff Trinh and the members of the Kentucky Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff Trinh's and the Kentucky Class members' actions were justified. Honda was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff Trinh, or the Kentucky Class.

295.    As a result of the concealment and/or suppression of the facts, members of the Kentucky Class sustained damage.

296.    Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Trinh's and the Kentucky Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**G.    Claims Brought on Behalf of the Michigan Class**

**COUNT SIXTEEN**
**Breach of Implied Warranty of Merchantability**
**Mich. Comp. Laws § 440.2314 & Mich. Comp. Laws § 440.2862**

297.    Plaintiff Paurang Patel brings this Count on behalf of members of the Michigan Class.

298.    Plaintiff Paurang Patel and the members of the Michigan Class are "buyers" and/or "lessees" within the meaning of Mich. Comp. Laws §§ 440.2103(1)(a) & 440.2803(1)(n).

299.    Honda is a "merchant" of the Class Vehicles within the meaning of Mich. Comp. Laws § 440.2104(1).

300.    Honda impliedly warranted to Plaintiff Paurang Patel and the members of the Michigan Class that its Class Vehicles were "merchantable" within the meaning of Mich. Comp. Laws §§ 440.2314 & 440.2862; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

301.    Mich. Comp. Laws §§ 440.2314 & 440.2862 states that goods must "pass without objection in the trade" under "the contract description" or "the description in the lease agreement" to be merchantable.

302.    The Class Vehicles would not pass without objection in the automotive trade because of the Spontaneous Airbag Deployment Defect in the Class Vehicles. Specifically, the Spontaneous Airbag

Deployment Defect may cause the airbags to suddenly deploy with little to no cause, posing safety risks and threatening to cause injury to Class Vehicle occupants.

303. Because of the Spontaneous Airbag Deployment Defect in the Class Vehicles, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

304. The Class Vehicles are not adequately labeled because the labeling fails to disclose the Spontaneous Airbag Deployment Defect in the Class Vehicles.

305. Honda breached the implied warranty of merchantability by manufacturing and selling and leasing the Class Vehicles containing the Spontaneous Airbag Deployment Defect. Furthermore, these defects have caused Plaintiff Paurang Patel and the members of the Michigan Class to not receive the benefit of their bargain.

306. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff Paurang Patel and the members of the Michigan Class received goods whose defective condition substantially impairs their value to Plaintiff Paurang Patel and the members of the Michigan Class. Plaintiff Paurang Patel and the members of the Michigan Class have been damaged as a result of the diminished value of their Class Vehicles.

307. Honda was provided notice of the Spontaneous Airbag Deployment Defect in Class Vehicles via consumer complaints to NHTSA regarding the Spontaneous Airbag Deployment Defect in Class Vehicles, NHTSA commencing a preliminary evaluation related to the Spontaneous Airbag Deployment Defect in Class Vehicles, and this lawsuit.

308. Pursuant to Mich. Comp. Laws §§ 440.2714 & 440.2A519, Plaintiff Paurang Patel and the members of the Michigan Class are entitled to damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, together with interest, attorneys' fees, and all other available relief.

**H.     Claims Brought on Behalf of the Nebraska Class**

**COUNT SEVENTEEN**
**Violation of Nebraska Consumer Protection Act**
**Neb. Rev. Stat. §§ 59-1601, *et seq.***

309. Plaintiff Griffin brings this Count on behalf of the Nebraska Class.

310. Nebraska' Consumer Protection Act ("NCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

311. Honda has at all relevant times engaged in "trade" and "commerce" as defined in Neb. Rev. Stat. § 59-1601(2), by advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in Nebraska and/or to Nebraska residents, directly or indirectly affecting the people of the State of Nebraska through that trade and commerce.

312. Honda's conduct, as described herein, was and is in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.* Honda's conduct violates Neb. Rev. Stat. §§ 59-1601, *et seq.* in at least the following ways:

   a. By knowingly and intentionally concealing from Plaintiff Griffin and the members of the Nebraska Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiff Griffin and the members of the Nebraska Class;

   b. By marketing the Class Vehicles as possessing functional and defect-free airbag systems; and

   c. =

   d. By violating federal laws, including the Motor Vehicle Safety Act, TREAD Act, and NHTSA regulations.

313. Honda's misrepresentations and omissions alleged herein caused Plaintiff Griffin and the members of the Nebraska Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff Griffin and the members of the Nebraska Class would not have purchased or leased their Class Vehicles or would have paid significantly less for them.

314. Accordingly, Plaintiff Griffin and the members of the Nebraska Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

315. Honda's misrepresentations and omissions affected (and continue to affect) the public interest through the sale of Class Vehicles, to Nebraska consumers, which possess the Spontaneous Airbag Deployment Defect.

316.    The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

317.    Pursuant to Neb. Rev. Stat. §§ 59-1601, *et seq.*, Plaintiff Griffin and the members of the Nebraska Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, together with interest, the costs of the suit, attorneys' fees, and all other available relief.

**COUNT EIGHTEEN**
**Violation of Nebraska Uniform Deceptive Trade Practices Act**
**Neb. Rev. Stat. § 87-301, *et seq.***

318.    Plaintiff Griffin brings this Count on behalf of the Nebraska Class.

319.    Under Nebraska's Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.* ("NUDTPA"), "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, he or she" engages in the following relevant practices: "[r]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have"; "[r]epresents that goods or services do not have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that have or that a person does not have a sponsorship, approval, status, affiliation, or connection that he or she has"; "[r]epresents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "[a]dvertises goods or services with intent not to sell them as advertised or advertises the price in any manner calculated or tending to mislead or in any way deceive a person[.]" Neb. Rev. Stat. § 87-302(a)(5), (6), (8), & (10).

320.    Honda, Plaintiff Griffin, and the members of the Nebraska Class are all "person[s]" as defined by Neb. Rev. Stat. § 87-301(19).

321.    The Class Vehicles are goods within the meaning of Neb. Rev. Stat. § 87-301, *et seq.*

322.    Honda has at all relevant times acted in the course of its business, as described in Neb. Rev. Stat. § 87-302(a), when engaging in the deceptive trade practices described herein relating to Honda

91

advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in Nebraska and/or to Nebraska residents.

323. Honda's conduct, as described herein, was and is in violation of the NUDTPA. Honda's conduct violates the NUDTPA in at least the following ways:

a. By knowingly and intentionally concealing from Plaintiff Griffin and the members of the Nebraska Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiff Griffin and the members of the Nebraska Class;

b. By marketing the Class Vehicles as possessing functional and defect-free airbag systems;and

c. By violating federal laws, including the Motor Vehicle Safety Act, TREAD Act, and NHTSA regulations.

324. Honda's misrepresentations and omissions alleged herein were intended to induce Plaintiff Griffin and the members of the Nebraska Class to make their purchases or leases of their Class Vehicles.

325. Honda's misrepresentations and omissions alleged herein caused Plaintiff Griffin and the members of the Nebraska Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff Griffin and the members of the Nebraska Class would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Spontaneous Airbag Deployment Defect.

326. Accordingly, Plaintiff Griffin and the members of the Nebraska Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

327. The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

328. Pursuant to Neb. Rev. Stat. § 87-303, Plaintiff Griffin and the members of the Nebraska Class seek equitable relief against Honda for committing the deceptive trade practices described herein, together with interest, the costs of the suit, and attorneys' fees because Honda has willfully engaged in the trade practices described herein which Honda knew to be deceptive, and all other available relief.

**COUNT NINETEEN**
**Fraudulent Concealment**
**Based on Nebraska Law**

329.    Plaintiff Griffin brings this Count on behalf of the Nebraska Class.

330.    As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

331.    Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those already stated.

332.    In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiff Griffin and the members of the Nebraska Class.

333.    Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

334.    Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Griffin and the members of the Nebraska Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

335.    Honda still has not made full and adequate disclosure and continues to defraud Plaintiff Griffin and the members of the Nebraska Class.

336.    These omitted material facts were not within Plaintiff Griffin and the Nebraska Class members' reasonably diligent attention, observation or judgment. Plaintiff Griffin and the Nebraska Class members would not have acted as they did if they had known of the concealed and/or suppressed facts.

93

Plaintiff Griffin and the Nebraska Class members' actions were justified. Honda was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff Griffin, or the Class.

337.   As a result of the concealment and/or suppression of the facts, members of the Nebraska Class sustained damage.

338.   Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Griffin's and the Nebraska Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

I.     **Claims Brought on Behalf of the North Carolina Class**

**COUNT TWENTY**
**Violation of North Carolina's Unfair and Deceptive Trade Practices Act (NCUDTPA)**
**N.C. Gen. Stat. §§ 75-1.1, *et seq.***

339.   Plaintiffs Moore and Carr bring this Count on behalf of the North Carolina Class.

340.   North Carolina's Unfair and Deceptive Trade Practices Act ("NCUDTPA") prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

341.   Under N.C. Gen. Stat. §§ 75-1.1 *et seq.*, an act or practice is deceptive if it has the capacity or tendency to deceive, and a practice is unfair if it offends established public policy or is otherwise immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. N.C. Gen. Stat. § 75-1.1.

342.   Honda has at all relevant times engaged in "commerce" as defined in N.C. Gen. Stat. § 75-1.1(b), by advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in North Carolina and/or to the residents of North Carolina, directly or indirectly affecting North Carolina citizens through that commerce.

343.   Honda's conduct, as described herein, was and is in violation of N.C. Gen. Stat. §§ 75-1.1 *et seq.* Honda's conduct violates N.C. Gen. Stat. §§ 75-1.1 *et seq.* in at least the following ways:

a.    By knowingly and intentionally concealing from Plaintiffs Moore and Carr and the members of the North Carolina Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs Moore and Carr and the members of the North Carolina Class;

94

Class Action Complaint – Case No. 26-cv-04431

b.      By marketing the Class Vehicles as possessing functional and defect-free airbag systems; and

c.      By violating federal laws, including the Motor Vehicle Safety Act, TREAD Act, and NHTSA regulations.

344.    Honda's misrepresentations and omissions alleged herein caused Plaintiffs Moore and Carr and the members of the North Carolina Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs Moore and Carr and the members of the North Carolina Class would not have purchased or leased their Class Vehicles, or would have paid significantly less for them.

345.    Accordingly, Plaintiffs Moore and Carr and the members of the North Carolina Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

346.    The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

347.    Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs Moore and Carr and the members of the North Carolina Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, together with interest, attorneys' fees, and all other available relief.

**COUNT TWENTY-ONE**
**Fraudulent Concealment**
**Based on North Carolina Law**

348.    Plaintiffs Moore and Carr bring this Count on behalf of the North Carolina Class.

349.    As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

350.    Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because

95

where one does speak one must speak the whole truth and not conceal any facts that materially qualify those already stated.

351.    In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiffs Moore and Carr and the members of the North Carolina Class.

352.    Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

353.    Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs Moore and Carr and the members of the North Carolina Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

354.    Honda still has not made full and adequate disclosure and continues to defraud Plaintiffs Moore and Carr and the members of the North Carolina Class.

355.    Plaintiffs Moore and Carr and the members of the North Carolina Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs Moore and Carr's and the North Carolina Class members' actions were justified. Honda was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs Moore and Carr, or the Class.

356.    As a result of the concealment and/or suppression of the facts, members of the North Carolina Class sustained damage.

357.    Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs Moore and Carr's and the North Carolina Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**J.      Claims Brought on Behalf of the Ohio Class**

**COUNT TWENTY-TWO**
**Violation of Ohio Consumer Sales Practice Act**
**Ohio Rev. Code Ann. § 1345.01, *et seq.***

358.    Plaintiff Veerabrahma brings this Count on behalf of the Ohio Class.

359.    The Ohio Consumer Sales Practice Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* ("OCSPA"), provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction . . . whether it occurs before, during, or after the transaction." *Id*. at § 1345.02(A).

360.    Under the OCSPA, without limitation as to the scope, "the act or practice of a supplier in representing any of the following is deceptive": "[t]hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have"; and "[t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. §§ 1345.02(B)(1) and (2).

361.    Honda, Plaintiff Veerabrahma, and the members of the Ohio Class are each "person[s]" as defined by Ohio Rev. Code Ann. § 1345.01(B).

362.    Honda is a "supplier" within the meaning of Ohio Rev. Code Ann. § 1345.01(C) because it has at all relevant times been either a seller, lessor, or other person "engaged in the business of effecting or soliciting consumer transactions, whether or not [it] deals directly with the consumer." Specifically, Honda has advertised, offered for sale, sold, leased, and/or distributed the Class Vehicles in Ohio, affecting Ohio citizens through that trade and commerce.

363.    Plaintiff Veerabrahma and the members of the Ohio Class are all "consumer[s]" as defined by Ohio Rev. Code Ann. § 1345.01(D) because they are each "a person who engages in a consumer transaction with a supplier" by having purchased or leased Class Vehicles from Honda.

364.    Honda's conduct, as described herein, was and is in violation of the OCSPA. Honda's conduct violates the OCSPA in at least the following ways:

      a.   By knowingly and intentionally concealing from Plaintiff Veerabrahma and the members of the Ohio Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiff Veerabrahma and the members of the Ohio Class;

97

b.  By marketing the Class Vehicles as possessing functional and defect-free airbag systems;

c.  By failing to repair and/or replace the Spontaneous Airbag Deployment Defect in Class Vehicles; and

d.  By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect.

365.    Honda's misrepresentations and omissions alleged herein were intended to induce Plaintiff Veerabrahma and the members of the Ohio Class to make their purchases or leases of their Class Vehicles.

366.    Plaintiff Veerabrahma and the members of the Ohio Class justifiably relied on Honda's misrepresentations and omissions alleged herein. Honda's misrepresentations and omissions caused Plaintiff Veerabrahma and the members of the Ohio Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff Veerabrahma and the members of the Ohio Class would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Spontaneous Airbag Deployment Defect.

367.    Accordingly, Plaintiff Veerabrahma and the members of the Ohio Class have suffered ascertainable loss of money or property as a result of Honda's misrepresentations and omissions.

368.    Pursuant to Ohio Rev. Code Ann. § 1345.09, Plaintiff Veerabrahma and the members of the Ohio Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, treble damages, and attorneys' fees and costs.

### COUNT TWENTY-THREE
### Fraudulent Concealment
### Based on Ohio Law

369.    Plaintiff Veerabrahma brings this Count on behalf of the Ohio Class.

370.    As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles.

98

371. Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

372. In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiff Veerabrahma and the members of the Ohio Class. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

373. Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

374. Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Veerabrahma and the members of the Ohio Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

375. Honda still has not made full and adequate disclosure and continues to defraud Plaintiff Veerabrahma and the members of the Ohio Class.

376. Plaintiff Veerabrahma and the members of the Ohio Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff Veerabrahma's and the Ohio Class members' actions and reliance upon Honda's omissions and misrepresentations were justified. Honda was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff Veerabrahma, or the Ohio Class.

377. As a result of the concealment and/or suppression of the facts, Plaintiff Veerabrahma and the members of the Ohio Class sustained damage.

378.    Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Veerabrahma's and the Ohio Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT TWENTY-FOUR**
**Breach of Implied Warranty of Merchantability**
**Ohio Rev. Code Ann. §§ 1302.27 & 1310.19**

379.    Plaintiff Veerabrahma brings this Count on behalf of the Ohio Class.

380.    Plaintiff Veerabrahma and the members of the Ohio Class are "buyers" and/or "lessees" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(A)(1) & 1310.01(A)(14).

381.    Honda is a "merchant" of the Class Vehicles within the meaning of Ohio Rev. Code Ann. §§ 1302.01(A)(5).

382.    Honda impliedly warranted to Plaintiff Veerabrahma and the members of the Ohio Class that its Class Vehicles were "merchantable" within the meaning of Ohio Rev. Code Ann. §§ 1302.27 & 1310.19; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

383.    Ohio Rev. Code Ann. §§ 1302.27 & 1310.19 state that goods must "pass without objection in the trade under the contract description" or "the description in the lease agreement" to be merchantable.

384.    The Class Vehicles would not pass without objection in the automotive trade because of the Spontaneous Airbag Deployment Defect in the Class Vehicles. Specifically, the Spontaneous Airbag Deployment Defect may cause the airbags to suddenly deploy with little to no cause, posing safety risks and threatening serious injury to passengers in the Class Vehicles and hindering operability of the Class Vehicles. In addition, the defective airbags were not adequately designed, manufactured, and tested.

385.    Because of the Spontaneous Airbag Deployment Defect in the Class Vehicles, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

386.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Spontaneous Airbag Deployment Defect in the Class Vehicles.

387.    The Spontaneous Airbag Deployment Defect is a major safety defect. Honda breached the implied warranty of merchantability by manufacturing and selling and leasing the Class Vehicles

containing the Spontaneous Airbag Deployment Defect. Furthermore, these defects have caused Plaintiff Veerabrahma and the members of the Ohio Class to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

388.    As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff Veerabrahma and the members of the Ohio Class received goods whose defective condition substantially impairs their value to Plaintiff Veerabrahma and the members of the Ohio Class. Plaintiff Veerabrahma and the members of the Ohio Class have been damaged as a result of the diminished value of Honda's products and the products' malfunctioning.

389.    Pursuant to Ohio Rev. Code Ann. §§ 1302.88 & 1310.66, Plaintiff Veerabrahma and the members of the Ohio Class are entitled to damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles.

### K.    Claims Brought on Behalf of the Pennsylvania Class

**COUNT TWENTY-FIVE**
**Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law**
**73  Pa. Stat. § 201-1, *et seq.***

390.    Plaintiff Kupec brings this Count on behalf of the Pennsylvania Class.

391.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, *et seq.* ("UTPCPL"), prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 73 Pa. Stat. § 201-3(a).

392.    Under the UTPCPL, "unfair methods of competition" and "unfair or deceptive acts or practices" are enumerated in 73 Pa. Stat. § 201-2(4) and include, as relevant here, the following: "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have. . ."; "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another"; "advertising goods or services with intent not to sell them as advertised"; and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. § 201-2(4)(v), (vii), (ix), & (xxi).

101

393. Honda, Plaintiff Kupec, and the members of the Pennsylvania Class are each "person[s]" as defined by 73 Pa. Stat. §201-2(2).

394. Honda has at all relevant times engaged in "trade" and "commerce" as defined in 73 Pa. Stat. §201-2(3), by advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in Pennsylvania, affecting Pennsylvania citizens through that trade and commerce.

395. Honda's conduct, as described herein, was and is in violation of the UTPCPL. Honda's conduct violates the UTPCPL in at least the following ways:

      a. By knowingly and intentionally concealing from Plaintiff Kupec and the members of the Pennsylvania Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiff Kupec and the members of the Pennsylvania Class;

      b. By marketing the Class Vehicles as possessing functional and defect-free airbag systems;

      c. By failing to repair and/or replace the Spontaneous Airbag Deployment Defect in Class Vehicles; and

      d. By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect.

396. Honda's misrepresentations and omissions alleged herein were intended to induce Plaintiff Kupec and the members of the Pennsylvania Class to make their purchases or leases of their Class Vehicles.

397. Plaintiff Kupec and the members of the Pennsylvania Class justifiably relied on Honda's misrepresentations and omissions alleged herein. Honda's misrepresentations and omissions caused Plaintiff Kupec and the members of the Pennsylvania Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff Kupec and the members of the Pennsylvania Class would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Spontaneous Airbag Deployment Defect.

398. Accordingly, Plaintiff Kupec and the members of the Pennsylvania Class have suffered ascertainable loss of money or property as a result of Honda's misrepresentations and omissions.

399. Pursuant to 73 Pa. Stat. § 201-9.2(a), Plaintiff Kupec and the members of the Pennsylvania Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, treble damages, and attorneys' fees and costs.

**L.      Claims Brought on Behalf of the Texas Class**

**COUNT TWENTY-SIX**
**Fraudulent Concealment**
**Based on Texas Law**

400. Plaintiffs Amlani, Lee, Maynard, and Mohammed bring this Count on behalf of the Texas Class.

401. As set forth above, Honda concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles during the Class Period.

402. Honda had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of Honda's highest corporate priorities. Once Honda made representations to the public about safety, quality, functionality, and reliability, Honda was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

403. In addition, Honda had a duty to disclose these omitted material facts because they were known and/or accessible only to Honda which has superior knowledge and access to the facts, and Honda knew they were not known to or reasonably discoverable by Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

404. Whether the Class Vehicles' airbags work and whether the airbags spontaneously deploy with little to no cause are material safety concerns. Honda possessed exclusive knowledge of the defects, rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

405. Honda actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

406. Honda still has not made full and adequate disclosure and continues to defraud Plaintiff Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class.

407. Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs Amlani, Lee, Maynard, and Mohammed's and the Texas Class members' actions were justified. Honda was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs Amlani, Lee, Maynard, and Mohammed, or the Texas Class.

408. As a result of the concealment and/or suppression of the facts, members of the Texas Class sustained damage.

409. Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs Amlani, Lee, Maynard, and Mohammed's and the Texas Class members' rights and well-being to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT TWENTY-SEVEN**
**Breach of Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code § 2.314 & Tex. Bus. & Com. Code § 2A.212**

410. Plaintiffs Amlani, Lee, Maynard, and Mohammed bring this Count on behalf of the Texas Class.

411. Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class are "buyers" and/or "lessees" within the meaning of Tex. Bus. & Com. Code §§ 2.103(a)(1) & 2A.103(a)(14).

412. Honda is a "merchant" of the Class Vehicles within the meaning of Tex. Bus. & Com. Code §§ 2.104(a).

413.     Honda impliedly warranted to Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class that its Class Vehicles were "merchantable" within the meaning of Tex. Bus. & Com. Code §§ 2.314 & 2A.212; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

414.     Tex. Bus. & Com. Code § 2.314 and Tex. Bus. & Com. Code § 2A.212 state that goods must "pass without objection in the trade" under "the contract description" or "the description in the lease agreement" to be merchantable.

415.     Because of the Spontaneous Airbag Deployment Defect in the Class Vehicles, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

416.     The Class Vehicles are not adequately labeled because the labeling fails to disclose the Spontaneous Airbag Deployment Defect in the Class Vehicles.

417.     Honda breached the implied warranty of merchantability by manufacturing and selling and leasing the Class Vehicles containing the Spontaneous Airbag Deployment Defect. Furthermore, these defects have caused Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

418.     As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class received goods whose defective condition substantially impairs their value to Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class. Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class have been damaged as a result of the diminished value of Honda's products, the products' malfunctioning, and the non-use of their Class Vehicles.

419.     Honda was provided notice of the Spontaneous Airbag Deployment Defect in Class Vehicles via consumer complaints to NHTSA regarding the Spontaneous Airbag Deployment Defect in Class Vehicles, NHTSA commencing a preliminary evaluation related to the Spontaneous Airbag Deployment Defect in Class Vehicles, the filing of this Complaint, the allegations contained in this Complaint, and/or other notice provided by Plaintiffs' counsel.

420.    Pursuant to Tex. Bus. & Com. Code §§ 2.714 & 2A.519, Plaintiff Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class are entitled to damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles.

**COUNT TWENTY-EIGHT**
**Violation of Texas Deceptive Trade Practices-Consumer Protection Act**
**Tex. Bus. & Com. Code § 17.41 *et seq.***

421.    Plaintiffs Amlani, Lee, Maynard, and Mohammed bring this Count on behalf of members of the Texas Class.

422.    The Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 *et seq.* ("DTPA"), prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a).

423.    Under the DTPA, "false, misleading, or deceptive acts or practices" include, but are not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not"; "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; "advertising goods or services with intent not to sell them as advertised"; and "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed[.]" Tex. Bus. & Com. Code § 17.46(b)(5), (7), (9), & (24).

424.    Honda, Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class are each "persons" as defined by Tex. Bus. & Com. Code § 17.45(3).

425.    The Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1).

426.    Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class are "consumers" as defined in Tex. Bus. & Com. Code § 17.45(4).

Class Action Complaint – Case No. 26-cv-04431

427. Honda has at all relevant times engaged in "trade" and "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6), by advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

428. Honda's conduct, as described herein, was and is in violation of the DTPA. Honda's conduct violates the DTPA in at least the following ways:

  a. By knowingly and intentionally concealing from Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class;

  b. By marketing the Class Vehicles as possessing functional and defect-free airbag systems;

  c. By failing to repair and/or replace the Spontaneous Airbag Deployment Defect in Class Vehicles; and

  d. By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect.

429. Honda's misrepresentations and omissions alleged herein were intended to induce Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class to make their purchases or leases of their Class Vehicles.

430. Honda's misrepresentations and omissions alleged herein caused Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs Amlani, Lee, and Maynard and the members of the Texas Class would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Spontaneous Airbag Deployment Defect.

431. Accordingly, Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class have suffered injury in fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

432.    The value of the Class Vehicles has greatly diminished due to the Spontaneous Airbag Deployment Defect. In light of the stigma attached to the Class Vehicles, they are now worth significantly less than they otherwise would be.

433.    Pursuant to Tex. Bus. & Com. Code § 17.50(b), Plaintiffs Amlani, Lee, Maynard, and Mohammed and the members of the Texas Class seek damages and other legal and equitable relief, including, at their election, the purchase and/or lease price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles, treble damages, damages for mental anguish, attorneys' fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Proposed Classes, respectfully request that the Court enter judgment in their favor and against Honda, as follows:

A.    Certification of the proposed Classes, including appointment of Plaintiffs as Class Representative and Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining Honda from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Appropriate injunctive relief;

D.    Equitable relief in the form of buyback of the Class Vehicles;

E.    Costs, restitution, damages, including statutory and punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.    An order requiring Honda to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.    The establishment of a Honda-funded program for Plaintiffs and members of the Classes to recover out-of-pocket costs incurred in connection with the Spontaneous Airbag Deployment Defect, including but not limited to costs of repair, replacement of deployed airbag components, vehicle rental, towing, and diminution in value;

I.    Such other or further relief as may be appropriate.

Class Action Complaint – Case No. 26-cv-04431

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: May 13, 2026                                    Respectfully submitted,

                                                       **BATHAEE DUNNE LLP**

                                                        /s/ Yavar Bathaee
                                                       Yavar Bathaee (CA 282388)
                                                       yavar@bathaeedunne.com
                                                       Andrew C. Wolinsky (CA 345965)
                                                       awolinsky@bathaeedunne.com
                                                       445 Park Avenue, 9th Floor
                                                       New York, NY 10022
                                                       Tel.: (332) 322-8835

                                                        /s/ Brian J. Dunne
                                                       Brian J. Dunne (CA 275689)
                                                       bdunne@bathaeedunne.com
                                                       Edward M. Grauman (*p.h.v.* forthcoming)
                                                       egrauman@bathaeedunne.com
                                                       Kaki J. Johnson (*p.h.v. forthcoming*)
                                                       kjohnson@bathaeedunne.com
                                                       901 South Mopac Expressway
                                                       Barton Oaks Plaza I, Suite 300
                                                       Austin, TX 78746
                                                       Tel.: (332) 223-4386

                                                       Allison Watson (CA 328596)
                                                       awatson@bathaeedunne.com
                                                       Priscilla Ghita (admission pending in California)
                                                       pghita@bathaeedunne.com
                                                       3420 Bristol Street Suite 600
                                                       Costa Mesa, CA 92626
                                                       Tel.: (213) 458-7075

                                                       *Attorneys for the Plaintiffs and Proposed Classes*

Class Action Complaint – Case No. 26-cv-04431